FAMILY GROUP, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4673–70. Filed February 12, 1973.

*Samuel C. Ullman, Robert F. O'Malley,* and *Richard H. Hunt, Jr.,* for the petitioner.

*Marlene Gross,* for the respondent.

FORRESTER, *Judge:* Respondent has determined a deficiency of $4,654.79 in petitioner's income tax for the taxable year 1967. The issues presented for our decision are (1) whether petitioner as holder of second mortgages on certain properties is entitled to deduct amounts which were paid to discharge prior liens on the same properties, (2) whether petitioner is liable for the personal holding company tax, and (3) whether petitioner is entitled to deductions for purported interest payments.

### FINDINGS OF FACT

Some of the facts were stipulated and are so found.

Petitioner is a corporation which had its principal office in Woodmere, N.Y., at the time it filed the petition herein. Petitioner filed its original and amended Federal income tax returns for the taxable year 1967 with the district director of internal revenue in Brooklyn, New York. Both returns were filed using the cash receipts and disbursements method of accounting.

Petitioner was incorporated under the laws of Delaware on November 18, 1964. Upon incorporation petitioner issued 564 shares of no-par stock and $564,000 in 6-percent general obligation bonds, all to Sadie Cooper-Smith (Sadie). Sadie's husband, Morris Cooper-Smith (Morris), has been the president of petitioner since its formation.

Less than $1,000 in cash was transferred to petitioner upon its incorporation. Petitioner's only other assets consisted of eight junior mortgages and underlying notes all of which were assigned to petitioner by other corporations which were also under the control of

Morris and Sadie. The junior mortgages were created as part of the series of transactions described below.

At the time petitioner was incorporated, Morris and Sadie already controlled several other corporations, including Alrob Realty Co., Inc. (Alrob), Bobal Holding Corp. (Bobal), Brother & Sister Realty Co., Inc. (Brother-Sister), and Almeda Burchell Realty Co., Inc. (Almeda).

In November 1964, Alrob, Bobal, and Brother-Sister owned parcels of land which were subject to mortgages and real estate tax liens. The mortgagees were Josephine Peiser, Lawrence Cedarhurst Federal Savings & Loan Association, and the Small Business Administration. More information in respect of these properties and liens is provided in the following table:

TABLE 1

| Parcel | Owner-mortgagor | Total of mortgages and real estate tax liens |
|---|---|---|
| 1. 300–314 Beach 67th Street, Arverne, New York. | Bobal Holding Corp _ _ _ _ _ | $27,000 |
| 2. 501–503 Beach 19th Street, Far Rockaway, New York. | Alrob Realty Co., Inc _ _ _ _ | 15,350 |
| 3. 1362 Gipson Street, Far Rockaway, New York. | Bobal Holding Corp _ _ _ _ _ _ | 9,000 |
| 4. 1908–1914 Brookhaven Avenue, Far Rockaway, New York. | Brother & Sister Realty Co., Inc. | 14,000 |
| 5. 2920 Healy Avenue, Far Rockaway, New York. | Bobal Holding Corp _ _ _ _ _ _ | 6,000 |
| 6. 7234 Burchell Avenue, and 7235–7237 Almeda Avenue, Arverne, New York. | Bobal Holding Corp _ _ _ _ _ | 11,000 |
| 7. 7239 Almeda Avenue, Arverne, New York. | Bobal Holding Corp _ _ _ _ _ _ | 6,000 |
| 8. 7236–7240 Burchell Avenue, Arverne, New York. | Bobal Holding Corp _ _ _ _ _ _ | 17,000 |
| Total liens _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | 105,350 |

For convenience, we will hereinafter refer to these parcels individually by number, and collectively as the ABS properties.

The ABS properties had been owned by corporations controlled by Sadie and Morris since 1934. During the period from 1934 to 1964, Sadie had advanced large sums of money to Almeda, Bobal, and Brother-Sister. These corporations in turn advanced the money to the corporate owners of the ABS properties—Alrob, Bobal, and Brother-Sister. The owners used these funds to improve the ABS properties. By 1964 Sadie's advances totaled $564,000.

In 1964 Alrob, Bobal, and Brother-Sister desired to sell the ABS properties. The prospective buyer was an unrelated party, Brookrock Realty Corp. (Brookrock).

In order to facilitate the sale of the ABS properties, Alrob, Bobal, and Brother-Sister agreed to accept a minimal downpayment of $20,-000. However, Brookrock agreed to purchase subject to large junior mortgages which were executed in respect of the ABS properties on November 24, 1964. The purpose of the junior mortgages was to secure eventual repayment of the $564,000 which Sadie had invested in the ABS properties by her indirect advances through Almeda Burchell, Bobal, and Brother-Sister.

The junior mortgages were drawn to include the senior liens listed above in Table 1; consequently, each of the junior mortgages and corresponding notes contained provisions which obligated the respective holders thereof to discharge the senior liens out of the money collected. Each of the junior mortgages contained the following:

THIS MORTGAGE of * * * requires the holder thereof, to discharge out of Payments and or Collections received hereunder, a total of * * * which represents current mortgages, unpaid taxes and assessments and debts, as indicated in a Schedule of even date, and which is attached to the Bond.

THIS MORTGAGE is SUBORDINATE to, but inclusive of EXISTING MORTGAGES now on record and UNPAID TAXES, with interest thereon to December 31st, 1964.

PAYMENTS made against this mortgage by the owner of the property covered by this mortgage are to be transmitted to the holder of this mortgage for direct forwarding to the ultimate recipient and the principal or taxes so paid (exclusive of interest accruing after January 1st, 1965) shall be deducted from the Scheduled Obligations of * * *

Each of the notes accompanying the junior mortgages included the following clause:

The * * * [obligee] and or its assigns recognizes an obligation to pay the total sum of * * * [the prior mortgages and liens] for the account of the * * * [obligor] out of all moneys collected under this agreement, as per attached schedule.

The aggregate face amount of the junior mortgages was $665,000, which was calculated to approximate the sum of (1) the senior mortgages and tax liens shown above in Table 1 ($105,350), and (2) the total amount of money advanced by Sadie ($564,000). More detailed information in respect of these junior mortgages and the underlying notes is supplied by the following table:

TABLE 2

| Mortgaged property | Mortgagor obligor | Mortgagee obligee | Face amount of note and mortgage | Senior liens to be paid by mortgagee |
|---|---|---|---|---|
| 1. | Bobal | Brother-Sister | $135,000 | $27,000 |
| 2. | Alrob | Bobal | 80,000 | 15,350 |
| 3. | Bobal | Brother-Sister | 65,000 | 9,000 |
| 4. | Brother-Sister | Bobal | 80,000 | 14,000 |
| 5. | Bobal | Brother-Sister | 45,000 | 6,000 |
| 6. | Bobal | Almeda Burchell | 93,000 | 11,000 |
| 7. | Bobal | Almeda Burchell | 49,000 | 6,000 |
| 8. | Bobal | Almeda Burchell | 118,000 | 17,000 |
| | Total | | 665,000 | 105,350 |

On November 18, 1964, Alrob, Bobal, and Brother-Sister entered into contracts to sell the ABS properties to Brookrock. The properties were subsequently transferred to Brookrock by indentures dated December 31, 1964. Each of the contracts of sale and each of the indentures contained a provision comparable to the following: "[This property is transferred] subject to a presently existing [junior] mortgage in the sum of * * *, which said mortgage includes prior liens which are to be paid by the holders of said [junior] * * * mortgage." Each of the eight ABS properties was sold to Brookrock for the amount of its junior mortgage plus a relatively small sum of cash. The aggregate purchase price was $685,000, consisting of $20,000 in cash and $665,000 in mortgages.

In August 1965 Brookrock sold parcels 7 and 8 of the ABS property to Joseph Rudman, who owned them in 1967. Rudman paid Brookrock $100 and took the two properties subject to the senior and junior liens.

On November 24, 1964, Bobal, Brother-Sister, and Almeda assigned the eight junior mortgages and underlying notes to petitioner. They received in exchange for each mortgage "ten dollars and other valuable considerations." Petitioner's only business since its formation has been to service these junior mortgages.

During the years 1965, 1966, and 1967, substantial payments were made to the holders of the senior mortgages and tax liens on the ABS properties. Rudman and Brookrock made many of these payments. However, Brookrock was often unable to make payments when due, and in that event payment was made by either Bobal or petitioner.

Such payments were applied by the senior lienholders toward (1) mortgage principal, (2) interest and real estate taxes which had accrued prior to January 1, 1965, and (3) interest and real estate taxes which had accrued on or after January 1, 1965. Petitioner has substantiated that, of the total amounts paid to the senior lienholders in 1965, 1966, and 1967, the following amounts were applied to (1) mortgage principal and (2) interest and real estate taxes which had accrued prior to January 1, 1965.

TABLE 3

| Taxable year | Payments on pre-1965 real estate tax liens | Total principal plus pre-1965 interest | | | Total |
|---|---|---|---|---|---|
| | | Peiser mortgage | Lawrence Cedarhurst mortgage | Small Business Administration mortgage | |
| 1965 | $6,282.00 | $9,000.00 | $5,233.59 | $1,680.00 | $22,544.66 |
| 1966 | 10,219.92 | 1,114.36 | 5,628.60 | 1,680.00 | 18,642.88 |
| 1967 | 11,289.35 | 1,131.89 | 6,312.13 | 1,680.00 | 20,413.37 |

Also, in 1965 petitioner paid $349.07 to discharge a lien which had arisen with respect to one of the ABS properties because of pre-1965 unpaid fuel oil bills.

664

In its amended Federal income tax returns for the years 1965, 1966, and 1967, petitioner claimed deductions for those payments which it allegedly made to the senior lienholders in respect of (1) mortgage principal and (2) interest and real estate taxes which had accrued prior to January 1, 1965. Respondent has disallowed such deductions for 1967, and has further disallowed any loss carry-forward to 1967 which was generated by such deductions in 1965 and 1966.

Petitioner's only income for the taxable year 1967 was $9,378.78 in interest which it received on the second mortgages and underlying notes. If we uphold respondent's disallowance of the deductions referred to above, petitioner will have net income for 1967. Respondent has determined that such income would be subject to the personal holding company tax.

All of the interest payments which petitioner received during 1967 were from Rudman. The properties owned by Brookrock were not profitable, and petitioner waived all interest owed to it on the six Brookrock mortgages for the years 1965, 1966, and 1967.

In 1967 petitioner had outstanding 564 shares of common stock and $564,000 in general obligation bonds. Sadie owned 470 shares of the stock and her daughter owned the remaining 94 shares. During 1967 Josephine Peiser had possession of 282 shares which Sadie had pledged to her as security on the senior mortgages. Petitioner paid no dividends on its stock during 1967.

All of petitioner's general obligation bonds were issued to Sadie at the time petitioner was incorporated. However, she began making gifts of the bonds immediately after they were issued, so that in 1967 ownership of the bonds was spread among a group consisting of at least six of her children and grandchildren in addition to herself. Each bond provided in part as follows:

The company with the consent in writing of a majority of the bondholders then outstanding and in force may modify the rate of interest payable and postpone or delay the payment of interest or principal and in the event of a default in the payment of principal or interest a majority of the then outstanding bondholders may excuse or waive such default and the consequences of such majority of bondholders shall be legally binding on any and all of the registered bondholders even though they may not consent to any waiver, modification or postponement as herein provided.

\* \* \* \* \* \* \*

Simultaneously with the issuance of this bond the Company has issued to the then owner and holder of the bond one share of stock of the Company for each $1000.00 of face value of each bond, it being the intention of the Company that each bondholder shall be a shareholder of the Company in the proportion above set forth, and that neither the shares of stock nor the bond herein shall be owned by diverse parties but any rights to principal and interest herein shall accrue hereunder only so long as the owner and holder of this bond shall be the owner and holder of such proportionate share of stock in the Company. Any transfer

of this bond without the simultaneous transfer of the proportionate share or shares of stock of the Company shall void any obligation hereunder.

On December 31, 1967, petitioner distributed $3,450 among all of the holders of its general obligation bonds except Sadie. However, not long after the bondholders received the distribution they loaned an equal amount of money back to petitioner. They did so because petitioner's attorney had informed them that they could not take any money out of the corporation while it was operating at a deficit.

On its amended Federal income tax return for 1967 petitioner claimed an interest deduction for the $3,450 distribution to its bondholders. Respondent has disallowed the deduction.

OPINION

## 1. *Payments on Senior Liens*

The first issue presented for our decision involves eight junior mortgages—one on each of the eight ABS properties—which, together with the underlying notes, were assigned to petitioner shortly after it was incorporated on November 18, 1964, and which were owned by petitioner throughout 1967, the year in issue. The junior mortgages were inclusive of various senior mortgages and tax liens and consequently required that the senior mortgages and liens be discharged out of collections.

Petitioner claims that it is entitled to deductions in 1967 for all payments which it made or caused to be made during the year to the senior mortgagees and lienholders in satisfaction of its obligations as the holder of the junior mortgages. Petitioner has also claimed a deduction in 1967 for net operating loss carryovers generated by comparable deductions taken in 1964 and 1965. Respondent argues that petitioner has not adequately substantiated the extent to which such payments were made, and that, even if proved, such payments are capital in nature and hence nondeductible.

The creation of the junior mortgages grew out of the sale of the ABS properties to Brookrock. Prior to the sale the ABS properties had been owned by Alrob, Bobal, and Brother-Sister, which, together with Almeda, were all corporations controlled by Sadie and Morris. Over the years Sadie had contributed a total of $564,000 to these corporations, which in turn advanced the money to each other for the purpose of developing and maintaining the ABS properties. Shortly before the sale to Brookrock in November 1964, these corporations executed a junior mortgage in respect of each of the eight ABS properties in order to secure eventual repayment of the $564,000. The aggregate face amount of the junior mortgage was drawn to approxi-

mate the sum of Sadie's advances plus the total of the senior mortgages and liens.

Immediately after the junior mortgages were created the mortgagees—Bobal, Brother-Sister, and Almeda—transferred their interests to petitioner, which had been incorporated by Sadie and Morris for the purpose of servicing the junior mortgages. The junior mortgage provisions which required the respective mortgagee to discharge the applicable senior mortgages and liens were negotiated and agreed upon by all concerned parties before petitioner was incorporated.

We hold first, as manifested in our findings above, that petitioner has adequately substantiated that most of the alleged payments to the senior mortgagees and lienholders were in fact made. We have reached this holding after a careful examination of a large number of checks and other memoranda which were almost literally "dumped" into the record. We will omit a lengthy analysis of how we reached this finding on the grounds that it would be not only extremely tedious, but also unnecessary in light of our holding regarding the nature of these payments.

We hold further that the payments on the senior mortgages and liens were capital expenditures rather than trade or business expenses. The obligation of the holder of each junior mortgage to make payments on the senior liens arose before the junior mortgages were transferred to petitioner, and therefore did not grow out of petitioner's own business operations. In fact, Morris' testimony at trial clearly indicates that petitioner's role as payor of the senior liens was planned prior to its incorporation, during the negotiations surrounding the sale of the ABS properties to Brookrock. For example, the following exchange took place between petitioner's counsel and Morris:

Q. Mr. Cooper-Smith, why did you agree, excuse me, why did the corporations of which you were president agree to pay off * * * [the senior mortgages and tax liens]?

A. We reached an impasse with Mr. Pickholtz, [president of Brookrock] who was an experienced real estate operator, and who was also familiar with the operation of some properties. * * * we were obliged in order to consummate that deal, the *Family Group* [petitioner] *was obliged to guarantee and assume the payment of* * * * [*the senior mortgages and tax liens*].

Q. Had you not so promised, did you feel that the deal would not have come off?

A. It couldn't come through.

[Emphasis supplied.]

Any payments which were made on the senior mortgages and liens were therefore contemplated from the moment petitioner acquired the junior mortgages, if not before, and such payments were motivated primarily by petitioner's obligations as holder of the junior mortgages. Furthermore, petitioner's agreement to discharge the senior

liens constituted a large part of the consideration received by the assignors of the junior mortgages. These facts plainly demonstrate that the payments at issue were simply part of the cost of petitioner's acquisition of the junior mortgages and were therefore nondeductible capital expenditures. *United States* v. *Smith*, 418 F. 2d 589, 596 (C.A. 5, 1969) ; *Portland Gasoline Co.* v. *Commissioner*, 181 F. 2d 538 (C.A. 5, 1950), affirming a Memorandum Opinion of this Court; *W. D. Haden Co.* v. *Commissioner*, 165 F. 2d 588 (C.A. 5, 1948) ; *Holdcroft Transp. Co.* v. *Commissioner*, 153 F. 2d 323 (C.A. 8, 1946), affirming a Memorandum Opinion of this Court; *Rodney, Inc.* v. *Commissioner*, 145 F. 2d 692 (C.A. 2, 1944), affirming 2 T.C. 1020 (1943).[1]

Petitioner's primary argument centers around the danger which it faced as junior mortgagee from the possibility of foreclosure if the payments on the senior mortgages and liens were defaulted. Petitioner claims that the payments were motivated by a desire to protect it from the clear proximate danger of foreclosure and should therefore be deductible under section 162 as ordinary and necessary business expenses, citing *Young & Rubicam, Inc.* v. *United States,* 410 F. 2d 1233, 1242 (Ct. Cl. 1969) ; *Cubbedge Snow*, 31 T.C. 585 (1958) ; *Charles J. Dinardo*, 22 T.C. 430 (1954) ; *Robert Gaylord, Inc.*, 41 B.T.A. 1119 (1940). For further examples of this line of cases, see *James L. Lohrke*, 48 T.C. 679 (1967), and cases cited; see also *Edward J. Miller*, 37 B.T.A. 830 (1938) ; *First National Bank of Skowhegan*, 35 B.T.A. 876 (1937).

It is true that this line of cases establishes an exception to the general rule that a taxpayer may not deduct payments in discharge of expenses or liabilities of another taxpayer. See, e.g., *Deputy* v. *duPont*, 308 U.S. 488 (1940) ; *Welch* v. *Helvering*, 290 U.S. 111 (1933). However, petitioner's argument must fail for at least two reasons. First, its reliance on this line of cases is misplaced because none of them dealt with a capital expenditure. Second, the *original* and *primary* motivation underlying the payments to the senior mortgagees and lienholders was the obligations which arose at the time petitioner acquired the junior mortgages, rather than simply from a desire to protect its investment.[2] *United States* v. *Smith, supra* at 596; *James L. Lohrke, supra* at 688–689; cf. *Arthur H. DuGrenier, Inc.*, 58 T.C. 931 (1972), and cases cited.

In its reply brief petitioner argues for the first time that the payments in issue were not capital expenditures because it did not assume

---

[1] Also see *M. Buten & Sons, Inc.*, T.C. Memo. 1972–44.

[2] Petitioner argues vigorously that it had no rights as a senior lienholder, which proves its sole motive to have been protection of its business assets. Petitioner ignores the fact that each payment made to a senior lienholder improved the quality of its junior mortgages to the point they would become "first" mortgages on full amortization of the senior liens.

personal liability on the senior liens at the time it was assigned the junior mortgages. Petitioner's untimely assertion of this argument has of course prevented respondent from developing the record on this point. Moreover, its new position appears to squarely contradict the testimony of its own witness, Morris Cooper-Smith, quoted *supra*. In any event it is settled that a debt to which a capital asset is subject becomes part of its cost basis regardless of whether the purchaser assumes personal liability on the debt. See, e.g., *Crane* v. *Commissioner*, 331 U.S. 1 (1947); *Blackstone Theatre Co.*, 12 T.C. 801 (1949). It clearly follows that subsequent discharge of such a debt by the purchaser is a capital expenditure.

## 2. *Personal Holding Company Tax*

The second issue is whether petitioner was subject to the personal holding company tax during 1967. This issue arises only because we have disallowed petitioner's claimed deductions for mortgage payments; if allowed, such deductions would have given petitioner a net loss for 1967.

Petitioner plainly meets the adjusted gross income requirement of section 542(a)(1), since 100 percent of its income was from interest. Sec. 543(a)(1). It is also clear that petitioner meets the stock ownership requirement of section 542(a)(2), since Sadie owned, either actually or constructively, all of petitioner's stock. See sec. 544(a)(2). Furthermore, petitioner fits within none of the various exceptions to personal holding company status. We hold, therefore, that petitioner is subject to the personal holding company tax.

## 3. *Bond Interest Deduction*

The third issue is whether petitioner is entitled to a deduction for purported interest payments made to the holders of its general obligation bonds on December 31, 1967. Respondent disallowed the deduction on the ground that the alleged interest was not paid on a bona fide indebtedness, and that the bonds were actually evidences of equity rather than debt.

Petitioner of course has the burden of proving that the bonds were bona fide indebtedness. Cases such as this, involving transactions among a number of corporations all controlled by the same parties, invite particular scrutiny because of the lack of arm's-length bargaining. *Cuyuna Realty Co.* v. *United States*, 382 F. 2d 298 (Ct. Cl. 1967).

A long line of precedents has established a great many criteria by which to judge whether an investment in a corporation is in actuality debt or equity. However, no one factor or set of factors is determinative, and each case must turn on its own facts. *John Kelly Co.* v. *Commissioner*, 326 U.S. 521 (1946).

It is clear from the facts of the instant case that the general obligation "bonds" actually evidenced an equity investment in petitioner, and we hold that the purported interest on such bonds is not deductible.

One of the most important distinctions between a shareholder and a creditor is that a shareholder puts his money at the risk of the business, whereas a creditor expects repayment in any event. *United States* v. *Title Guarantee & Trust Co.*, 133 F. 2d 990, 993 (C.A. 6, 1943) ; *Motel Corp.*, 54 T.C. 1433 (1970). Payment of the so-called bonds in the instant case was completely dependent on the profitability of petitioner's business operations. Petitioner's only operating assets were the eight junior mortgages. If they proved uncollectible the bondholders had nothing else to look to for payment.

Another important indication that a purported debt is actually equity is thin capitalization of the issuing corporation. *Berkowitz* v. *United States*, 411 F. 2d 818 (C.A. 5, 1969) ; *United States* v. *Henderson*, 375 F. 2d 36 (C.A. 5, 1967). At the time petitioner was incorporated, its debt-to-equity ratio was as high as 564 to 1. Its 564 shares of stock were issued for less than $1,000 in cash, while at the same time it issued $564,000 in general obligation bonds in respect of the junior mortgages. Even if we assume that the actual market value of the junior mortgages was substantially less than $564,000, petitioner would still have had an obviously excessive debt structure, since the value of its only operating assets was actually represented by its debt rather than its equity.

The fact that all of the debt of a corporation is owned by its shareholders in proportion to their stockholdings is yet another significant indication that the debt is simply additional equity capital. Upon incorporation petitioner issued all of its stock and bonds to Sadie, and each bond actually *prohibited* any transfer thereof unless accompanied by a transfer of a proportionate number of shares of petitioner's stock. Sadie apparently paid little heed to this clause, but, in any event, during 1967 the ownership of all of petitioner's stocks and bonds remained within Sadie's family.

It should also be noted that there is some question whether petitioner actually "paid" the alleged interest. Shortly after the bondholders received the purported interest payments they loaned an equal amount back to the corporation, believing that they couldn't take money out of petitioner while it was insolvent. Furthermore, the interest was apparently distributed selectively, since Sadie was a bondholder yet received no distribution. It is also worth pointing out the provision in the bonds which permitted a majority of the bondholders to authorize petitioner to modify the rate of interest or to waive any default in the payment of interest or principal on the bonds. It is difficult to imagine an independent third-party lender acting in such a manner or agreeing to such terms.

It is true that the nomenclature used by the parties is some evidence of the true nature of Sadie's original investment in petitioner. However, nomenclature and the parties' intent are far from determinative. *Austin Village, Inc.* v. *United States*, 432 F. 2d 741 (C.A. 6, 1970); *United States* v. *Henderson, supra; Motel Corp., supra.* When viewed as a whole, the record clearly supports our holding that the purported debt was in fact equity, and that the alleged interest payments are not deductible.

*Decision will be entered for the respondent.*