ELMER W. HILL and MARJORIE A. HILL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hill v. Commissioner
Docket No. 708-74.
United States Tax Court
T.C. Memo 1975-299; 1975 Tax Ct. Memo LEXIS 74; 34 T.C.M. (CCH) 1307; T.C.M. (RIA) 750299; September 25, 1975, Filed Elmer W. Hill, pro se. Robert J. Percy, for the respondent. *75 SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the years 1968, 1969, 1970, and 1971 in the following amounts: Year
Deficiency
1968
$1,758.04
1969
3,097.60
1970
600.12
1971
150.38
The issue for decision is whether advances of money made by Elmer W. Hill to a corporation of which he was a shareholder represented bona fide loans or contributions to capital; and, in the alternative if such advances are found to be loans, whether petitioners are entitled to a deduction of the amounts advanced as a business bad debt in 1970 when the advances became worthless or are limited to the treatment accorded nonbusiness bad debts. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Elmer W. and Marjorie A. Hill, husband and wife, who resided in Youngsville, Pennsylvania at the time their petition in this case was filed, filed joint Federal income tax returns for the taxable years 1968, 1969, 1970, and 1971 with the Internal Revenue Service Center at Philadelphia, Pennsylvania. Petitioners reported their income and deductions on the basis *76 of cash receipts and disbursements. Prior to 1961, Elmer W. Hill (hereinafter referred to as petitioner) was an employee, officer and stockholder of Cherry Grove Lumber Company (Cherry Grove) of Warren, Pennsylvania, which was engaged in the retail and wholesale lumber business. This lumber business was becoming less profitable due to the fact that there were fewer customers located in the area in which its products could normally be marketed. Petitioner, fearing that this situation would continue and become even more acute as time passed, decided to develop a new business in order to protect himself against the dwindling profitability of the business which was his main source of income. Therefore, in August of 1961, petitioner and T. K. Creal, who was a 51 per cent stockholder of Cherry Grove, formed Hill Enterprises, Inc. (Enterprises), a Pennsylvania corporation to organize and operate a winter skiing facility in Youngsville, Pennsylvania to be known as the Youngsville Skiway. At the time of the incorporation of Enterprises, September 18, 1961, petitioner transferred a total of $7,400, T. K. Creal transferred $7,723.82 and Cherry Grove Lumber Company transferred $10,000 to *77 the corporation. These amounts were accounted for on the books of Hill Enterprises, Inc. as follows: Capital Stock
Hill
$ 5,900.00
Creal
6,100.00
$12,000.00
Notes Payable
Hill
1,500.00
Creal
1,623.82
Cherry Grove Lumber Co.
10,000.00
$13,123.82
At the time of its incorporation, Enterprises issued a total of 1200 shares of stock with a par value of $10 per share. The shareholders and the number of shares held by each were as follows: Shareholder
Shares
Mr. E. W. Hill
590
Mr. T. K. Creal
609
Mrs. T. K. Creal
1
Total
1200
Enterprises was an accrual basis taxpayer with its fiscal year ending September 30. From the date of its incorporation through August of 1964 the officers of the corporation were: President
Mr. T. K. Creal
Vice President
Mrs. T. K. Creal
Secretary-Treasurer
Mr. E. W. Hill
From the beginning of its existence Enterprises was unprofitable. In August of 1964 an attempt was made by the shareholders to create a more sound financial structure for the corporation. The Creals returned their shares of stock to the corporation, thereby terminating their interest in the business. Petitioner paid *78 the Creals $500 for their interest in Enterprises and became the sole stockholder. Prior to this transaction the loan to Enterprises by Cherry Grove had been repaid primarily with funds advanced by petitioner. In 1964, shortly after petitioner became the sole stockholder of Enterprises, some additional shares were issued to him and in return for cash shares were issued to three other individuals. Thereafter the stock of Enterprises was held as follows: Shareholder
No. of Shares
Percentage Ownership
E. Hill
700
33-1/3
C. Barnard
350
16-2/3
J. Dailey
350
16-2/3
D. Lay
700
33-1/3
The new officers were as follows: President
Darell H. Lay
Vice-President
Cornelius G. Barnard
Secretary
Jack E. Dailey
Treasurer
Elmer W. Hill
Enterprises applied for and received a loan in the amount of $100,000 from the Small Business Administration (SBA) through the Pennsylvania Bank and Trust Company. The note given in exchange for these funds was executed by the corporation, but the shareholders, including petitioner and his wife, guaranteed payment of the loan. Petitioner had previously made advances to the corporation which were treated as loans *79 payable to him on the corporate books. In order for the corporation to obtain the SBA loan, petitioner was required to execute an agreement that the amounts shown on the corporate books as notes payable to him were subordinate to the SBA loan to the corporation. The proceeds of the loan received through the SBA were used to make various capital improvements to the corporate property, to purchase inventory, and to provide much needed working capital. However, Enterprises continued to operate at a loss subsequent to receiving the SBA loan. [1] Among the reasons for the corporate losses were inadequate resources within the corporate structure to support the initial start up costs and the fact that much less revenue than anticipated was received because of poor weather conditions for skiing. The officers of Enterprises had planned for petitioner to serve in the *80 capacity of manager of the corporate business for an initial salary of $2,000 per year which was to be increased as business improved. However, petitioner never received any amount as a salary from Enterprises although on some days he worked as much as twelve hours in an effort to make the corporate operation financially successful. Petitioner, however, continued in his employment with Cherry Grove. By July of 1970 the stockholders of Enterprises had determined that profitable operation of the corporation under their ownership was unlikely. The corporation's financial condition had worsened and the Small Business Administration was threatening to foreclose on the loan it had granted the corporation in 1964. Petitioner and the other shareholders began to look for a purchaser of their interests in Enterprises. An agreement was reached between Western Chautauqua Recreation, Inc. and the stockholders of Enterprises, that Western Chautauqua would purchase all the stock of Enterprises at 10 cents a share or a total of $210 and as additional consideration the purchasers would pay the outstanding balance of the Small Business Administration loan which amounted at the time of the sale to *81 approximately $56,728.47. Also under the terms of the agreement the amounts of money shown on the corporate books as due on a promissory note to petitioner and on notes to the other shareholders by Enterprises were cancelled. Petitioner made advances to Enterprises from time to time throughout the period that he was a shareholder. Each of these separate advances was designated as "notes payable" on the balance sheet of Enterprises. During the years 1961-1969 petitioner made the following advances to the corporation: Year
Amount
1961
$ 1,500.00
1962
12,350.00
1963
1,622.16
1964
33,306.84
1965
3,400.00
1966
3,800.00
1967
0
1968
0
1969
1,300.00
Total
$57,279.00
Petitioner made these advances because in his opinion he had no choice except to advance money to the corporation when payments for operating expenses became due and the corporation lacked funds to meet the debts. In some instances petitioner paid corporate utility bills, repair bills, and tax payments directly with his check drawn on his personal account. Lending institutions would not lend money directly to Enterprises, but banks with which its stockholders dealt would lend money to the *82 stockholders personally. At times Enterprises would draw a note payable to petitioner at the end of the year, but none of these notes were ever paid, nor did petitioner ever receive any interest payments with respect to these notes. No interest on these notes was accrued on Enterprises' books. Sometimes one note would be replaced with another showing petitioner's accumulated advances to Enterprises. These notes were all unsecured promissory notes. A note in the amount of $58,265.14 [2] payable to petitioner on January 1, 1970, with a stated interest rate of 4 per cent per annum was drawn by Enterprises under date of January 1, 1969. Petitioner did not receive any payment when the note fell due, nor did he receive any portion of the interest. This note was cancelled on September 29, 1970 upon the sale of the stock of Enterprises to the purchasing corporation. Petitioner was never repaid any amount advanced to Enterprises or any interest on such advances. *83 Prior to August 1964 the advances of funds by petitioner to Enterprises were not in proportion to his stockholdings, but subsequent to that time the shareholders by agreement made loans to the corporation in proportion to their percentage ownership. In 1964 petitioner's notes payable account on the corporate books increased by $33,306.84. Of this amount, $3,000 was money transferred to the corporation in 1964 and the remainder was a "note" given to petitioner for prior transfers. The amounts transferred subsequent to August 1964 by each of the stockholders were as follows: Year
Hill
Lay
Barnard
Dailey
1964
$3,000
$3,000
$1,500
$ 1,500
1965
3,400
3,400
1,700
1,700
1966
3,800
3,800
1,900
1,900
1967
0
0
0
0
1968
0
0
0
0
1969
1,300
1,300
650
650
Notes representing the amounts shown on the corporate books as owed to the other shareholders by Enterprises were also marked cancelled upon the sale of Enterprises' stock. Advances by the other shareholders had been treated in the same manner on the corporate books as had the advances by petitioner. On his 1970 Federal income tax return petitioner reported the sale of the stock *84 that he owned in Hill Enterprises, Inc. as a long-term capital loss. He treated the $57,279 he had advanced to the corporation as giving rise to an ordinary loss from a worthless business bad debt. On Schedule D submitted as part of his 1970 income tax return petitioner made the following notation: Taxpayer loaned above sum to Hill Enterprises, Inc. in order to protect his business interest in the company. In 1970, taxpayer was forced to sell his stock in the corporation because the company was in serious financial trouble which seriously threatened his own personal financial situation and the new owners would not accept the above liability. Thus, he has no possibility of recovery. On September 24, 1971, petitioner filed an Application for Tentative Refund from Carryback of Net Operating Loss or Unused Investment Credit (Form 1045) with the Internal Revenue Service Center at Philadelphia, Pennsylvania claiming carrybacks of net operating loss from 1970 to 1967, 1968 and 1969. On the basis of this application petitioner received tax refunds including interest for the claimed overpayments. Petitioner on his Federal income tax return for the year 1971 claimed the portion of the claimed *85 1970 net operating loss which had not been absorbed by the claimed carrybacks to 1967, 1968 and 1969 as an operating loss carryover to 1971. Respondent in determining petitioner's income tax for 1970 denied the deduction claimed by petitioner for a business bad debt of $57,279 because of the worthlessness of petitioner's advances to Hill Enterprises, Inc. Respondent determined deficiencies in petitioner's income tax for 1968 and 1969 by disallowing the claimed net operating loss carryback deductions previously allowed and determined a deficiency for 1971 by disallowing the claimed net operating loss carryover. At the trial and on brief respondent contends that the funds advanced to Enterprises by petitioner constitute contributions to capital rather than loans to that corporation and that petitioner was therefore entitled only to a long-term capital loss deduction because of these advances. In the alternative respondent maintains that if the advances are found to be loans, the advances resulted in nonbusiness bad debts entitling petitioner to a short-term capital loss rather than an ordinary loss deduction. OPINION *86 The determination of whether an advance to a corporation represents a loan or a contribution to capital presents a question of fact which has been often litigated. Gilbert v. Commissioner,262 F.2d 512 (2d Cir. 1959), affg. a Memorandum Opinion of this Court; A. R. Lantz Co. v. United States,424 F. 2d 1330, 1334 (9th Cir. 1970), and P. M. Finance Corporation v. Commissioner,302 F. 2d 786, 789 (3d Cir. 1962), affg. a Memorandum Opinion of this Court. In making this factual determination [3] a number of factors must be considered to ascertain the substance of the relationship between the shareholder and the corporation. The factors that are most often considered are: "(1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to regular corporate creditors; (7) the intent of the parties; (8) thin or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only *87 out of 'dividend' money; (11) the ability of the corporation to obtain loans from outside lending institutions." Tyler v. Tomlinson,414 F. 2d 844, 848 (5th Cir. 1969). See also Berkowitz v. United States,411 F. 2d 818, 820 (5th Cir. 1969). [4] Although the decided cases have listed a number of factors to be considered, there is no one factor determinative of whether the obligations are debts or capital investments. John Kelley Co. v. Commissioner,326 U.S. 521, 530 (1946). *88 Considering all the facts in this record in light of the factors which have been held to be indicative of capital contributions in other cases, we conclude that the advances by petitioner to Enterprises were contributions of capital. The strongest factors in favor of petitioner's argument of treating the advances as loans were the creation of a "loans payable" account on the corporate books reflecting the advances made by petitioner to Enterprises and the fact that documents entitled as promissory notes reflecting a cumulative total of the amount of petitioner's advances to Enterprises were drawn to petitioner. Generally such evidence, though by no means decisive, is some indication that a debtor-creditor relationship had been created. Motel Corp.,54 T.C. 1433, 1436 (1970). However, in the case before us the actions of the parties so strongly indicate that no debtor-creditor relationship was intended that the books and records are of little weight. Petitioner totally failed to follow a course that a prudent independent creditor would have taken in establishing a debtor-creditor *89 relationship with Enterprises. The evidence shows that "notes" were made "from time to time" and that as an old note would fall due it would be replaced with a new note, the old note apparently being destroyed. Petitioner testified that he made many advances in which "you just never got around to making notes." Such action is a cavalier approach to a purported debtor-creditor relationship. The only note presented into evidence was due on January 1, 1970, but as of the date of the sale of the corporation when the note was cancelled, there had been no payment of principal or interest on the note. In fact, petitioner never received payment of principal or interest on any of the other "notes" that were made by Enterprises for the advances of funds by petitioner, and even though the corporation was on an accrual basis of accounting it did not accrue any interest on these notes or advances on the corporate records. These facts tend to show that the parties did not have any serious expectation of payment upon the maturity dates of the "notes" issued to petitioner by Enterprises, a clear indication that petitioner's hope, if any, for repayment of the funds advanced depended totally on the *90 future profit of the corporation. The agreement between petitioner and the corporation lacked the usual indices of a debtor-creditor relationship. As pointed out in Family Group, Inc.,59 T.C. 660, 669 (1973), "One of the most important distinctions between a shareholder and a creditor is that a shareholder puts his money at the risk of the business, whereas a creditor expects repayment in any event." Here, petitioner had no realistic creditor safeguards. Normally the evidence of indebtedness is of prime consideration to the creditor, but it appears that this safeguard was of little importance to petitioner. The time the "notes" were issued did not necessarily correspond to the date that money was advanced by petitioner to the corporation. There is no evidence that petitioner made any demand for payment of or attempt to collect the advances and the clear inference is that he did not make such demand or collection effort. Rather petitioner continued to make advances to Enterprises when the corporation did not possess sufficient funds with which to pay the outstanding advances which petitioner had previously made. Also, the Small Business Administration required *91 in the loan agreement of 1964 that the advances made by petitioner, and any claim that might arise due to such advances, be subordinated to the funds advanced under the SBA loan. Such a complete subordination of claimed preexisting debt tends to wipe out a significant characteristic of the debtor-creditor relationship and in effect destroys the power of the creditor to demand payment at a fixed maturity date. P.M. Finance Corporation v. Commissioner,supra.
There is further evidence to indicate that the advances to the corporation were risk capital. Subsequent to the change in stock ownership in August 1964 the advances made by the shareholders, pursuant to agreement, were in proportion to their percentage ownership in Enterprises. It was necessary for the shareholders to make advances because the corporation had insufficient capital to absorb the cost of construction of buildings, ski lifts and the other various equipment items needed to operate such a business when revenue was less than anticipated. Furthermore, it became necessary to advance the money to cover routine expenses as they fell due. It is apparent that petitioner and the other shareholders had *92 no choice but to advance the funds if the corporation were to continue in business. If the shareholders had not advanced the funds the corporation would have soon become insolvent because no outside lender was willing to advance funds to the corporation. All these facts indicate that petitioner was placing his money "at the risk of the business." A. R. Lantz Co. v. United States,supra;Family Group, Inc.,supra.
Petitioner argues that he is being penalized because of the form of business in which he chose to operate his planned development of a skiway. Whether petitioner would have been entitled to more favorable tax treatment by choosing another form of business is immaterial to the issue before us. Here petitioner voluntarily adopted the corporate form to carry on his business and it is well settled law that the choice of the tax advantages of incorporation to do business requires the acceptance of its tax disadvantages. Ernest H. Weigman,47 T.C. 596, 606 (1967), affd. per curiam 400 F. 2d 584 (9th Cir. 1968); Estate of Martha M. Byers,57 T.C. 568, 578 (1972), *93 affd. 472 F. 2d 590 (6th Cir. 1973). Petitioner in his brief argues that he made the advances to protect his source of income. However, the evidence totally fails to support this contention. In fact petitioner testified that a major reason for making the advances was to protect his investment. In our view the evidence here shows that as a matter of substantial economic reality the advances by petitioner to Enterprises constituted a further advance of equity capital to the corporation. We hold that the funds advanced by petitioner to Enterprises are to be treated as contributions of capital in computing petitioner's Federal income taxes. Because we have reached the determination that the advances constituted a contribution to capital, it is not necessary to consider the alternative issue raised by respondent. The determination that the advances are further contribution of capital prevents the treatment of the $57,728.47 as an ordinary loss resulting from a worthless business bad debt. The advances must be treated as additional payment for stock for tax purposes and the basis of the "debt" is added to the basis of the other stock held by petitioner. Frank H. Gable,34 T.C. 228, 234 (1960); *94 Jewell Ridge Coal Corp. v. Commissioner,318 F. 2d 695, 698 (4th Cir. 1963), affg. a Memorandum Opinion of this Court. Therefore, the amount of $57,279 is properly to be added to petitioner's basis of the stock that he held in Enterprises and petitioner's capital loss upon the sale of that stock is properly to be computed under the provisions of sections 1211 and 1212.[5]
*95 Because the record is not entirely clear as to the steps used by respondent in the calculation of amount of the deficiencies, Decision will be entered under Rule 155.
Footnotes
1. Hill Enterprises lost money in each year of operation. The losses for the years 1961 through 1969 were as follows: ↩
1961
[ 3,016.10)
1964
[ 5,725.08)
1967
[ 9,670.55)
1962
( 6,075.01)
1965
(30,554.72)
1968
( 4,444.35)
1963
( 2,765.39)
1966
( 8,824.04)
1969
(10,966.52)
2. The principal amount shown on the note is an amount different than the total amount advanced to the corporation by petitioner. The difference does not result from accrued interest not paid to petitioner. The record does not disclose how the amount of this note was determined, but the parties have stipulated that the total amount advanced by petitioner to the corporation was $57,279.↩
3. The debt versus equity issue also commonly arises in the context of whether payments by a corporation to a shareholder are deductible under section 163 as interest paid on "loans" from a shareholder to the corporation or whether such payments constitute dividends paid if the corporation has available sufficient earnings and profits. The analysis used in determining the substance of such a transaction is similar to that used in determining the issue before us, whether the advance is to be treated as a loss on the sale of stock under section 165↩ or a bad debt under section 166. 4. The list of factors above is by no means exclusive because other factors often appear in decisions involving this issue. See Fin Hay Realty Co. v. United States,398 F. 2d 694 (3d Cir. 1968) which lists sixteen factors to be evaluated. Other factors have included the failure of the corporation to pay on the due date, the extent to which the initial advances were used to purchase capital assets, and the absence of any corporate provision to establish a means to retire the debt, such as a sinking fund. See Charter Wire, Inc. v. United States,309 F. 2d 878↩ (7th Cir. 1962).
5. Section 165(f) allows a deduction for loss on the sale of a capital asset only to the extent allowed by sections 1211 and 1212. 1211(b)(1) provides as follows: (b) Other Taxpayers.-- (1) In General.--In the case of a taxpayer other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus (if such losses exceed such gains) whichever of the following is smallest: (A) the taxable income for the taxable years, (B) $1,000, or (C) the sum of-- (i) the excess of the net short-term capital loss over the net long-term capital gain, and (ii) one-half of the excess of the net long-term capital loss over the net shortterm capital gain. 1212(b) provides as follows: (b) Other Taxpayers.-- (1) In General.--If a taxpayer other than a corporation has a net capital loss for any taxable year-- (A) the excess of the net short-term capital loss over the net long-term capital gain for such year shall be a short-term capital loss in the succeeding taxable year, and (B) the excess of the net long-term capital loss over the net short-term capital gain for such year shall be a long-term capital loss in the succeeding taxable year. (2) Special Rules.-- (A) For purposes of determining the excess referred to in paragraph (1)(A), an amount equal to the amount allowed for the taxable year under section 1211(b)(1)(A), (B), or (C) shall be treated as a short-term capital gain in such year. (B) For purposes of determining the excess referred to in paragraph (1)(B), an amount equal to the sum of-- (i) the amount allowed for the taxable year under section 1211(b)(1)(A), (B), or (C), and (ii) the excess of the amount described in clause (i) over the net short-term capital loss (determined without regard to this subsection) for such year, shall be treated as a short-term capital gain in such year.↩