JOHN D. THOMPSON, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

WESTWARD, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4396–77, 4397–77.    Filed February 25, 1980.

*George Constable,* for the petitioners.
*Matthew W. Stanley,* for the respondent.

FAY, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes and additions to taxes as follows:

| Docket No. | Petitioner | Year | Deficiency | Addition to tax sec. 6653(a)[1] |
|---|---|---|---|---|
| 4396–77 | John D. Thompson | 1973 | $5,752 | $288 |
|  |  | 1974 | 6,814 | 341 |
| 4397–77 | Westward, Inc. | 1973 | 11,925 | --- |
|  |  | 1974 | 5,338 | --- |

These cases have been consolidated for purposes of trial, briefing, and opinion.

Concessions having been made,[2] the remaining issues for decision are:

(1) Whether more than 20 percent of the gross receipts of petitioner Westward, Inc., for its taxable year 1973 was "interest" and therefore passive investment income within the meaning of section 1372(e)(5), so as to terminate its election under section 1372(a) to be treated as a small business corporation for 1973 and 1974.

(2) Whether more than 20 percent of the gross receipts of I-Cable Vision Programmers, Inc., for its taxable year 1974 was "rent" and therefore passive investment income within the meaning of section 1372(e)(5). If so, then I-Cable Vision Programmers, Inc.'s election under section 1372(a) to be treated as a small business corporation terminated in 1974 with the result that petitioner John Thompson is not entitled to deduct the amount that he claimed as his share of I-Cable Vision Programmers, Inc.'s 1974 loss.

(3) Whether petitioner John Thompson is entitled to a bad debt deduction under section 166 in 1974 for advances made to I-Cable Vision Programmers, Inc.[3]

---

[1]All statutory references are to the Internal Revenue Code of 1954, as amended, and in force during the years in issue.

[2]The parties settled a number of issues including the sec. 6653(a) addition to tax in the case of petitioner John Thompson, docket No. 4396–77.

[3]Petitioner Thompson, in an amendment to his petition filed after trial, claimed that if Cable Vision's subch. S status terminated in 1974, then in the alternative he was entitled to a bad debt deduction in 1974 for the amounts he advanced to Cable Vision in 1974. Respondent, in his answer to this amendment, denied each and every allegation made by petitioner.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

At the time of filing his petition herein, petitioner John D. Thompson resided in Seattle, Wash. Petitioner Westward, Inc., maintained its principal office in Seattle, Wash., at the time of filing its petition herein.

## *Westward*

Westward, Inc. (Westward), was incorporated on January 1, 1971. John D. Thompson (John) and his brother, Robert M. Thompson (Robert), each owned 49.5 percent of Westward's stock, and their mother, Ethyle M. Thompson, owned the remaining 1 percent. Robert was president and John was secretary-treasurer of Westward.

John and Robert each operated an income tax consulting and return preparation service in Seattle. John's office was in a building located at 5215 Ballard Ave., N.W. Westward's office was located in this same building across the hall from John's office. Robert's office was approximately one-half mile away from the offices of John and Westward in a building located at 1141 Northwest Market St.

On December 1, 1970, John, on behalf of Westward, filed an election to be taxed pursuant to the provisions of subchapter S of the Internal Revenue Code. The election was effective for Westward's first taxable year beginning January 1, 1971.

During 1973 and 1974, Westward was in the business of acquiring tax refund claims at a discount from taxpayers filing Form 1040 and Form 1040A Federal income tax returns. Beginning in January of each of these years, Westward would circulate flyers in various taverns advertising that it would provide an immediate cash refund to taxpayers who filed Form 1040A returns. The advertisements instructed the taxpayer to bring his or her W-2 Form into Westward's office in Seattle.

When a taxpayer would come into Westward's office, one of the three Westward employees would prepare the taxpayer's 1040A return and calculate the amount of any refund due.[4] If the taxpayer was entitled to a refund, a Westward employee

---

[4] When it was necessary for the taxpayer to file a Form 1040 return, John or Robert would prepare the return and then bill Westward for his services.

would fill out one of Westward's forms labeled "Tax Claim Refund & Sale Computation." The purpose of the form was to compute the amount of cash Westward would pay for the taxpayer's refund claim. The amount of cash to be paid to the taxpayer was calculated on this form by reducing the refund due the taxpayer by a "discount charge" of 33⅓ percent. Thus, Westward would acquire the right to receive a taxpayer's entire refund in exchange for two-thirds of the total amount of the refund due the taxpayer.

In addition, the taxpayer was required to fill out a form provided by Westward labeled "Refund Application." On this "Refund Application," the taxpayer was asked to provide the following information: various biographical data, the amount of any tax refund received the previous year, whether returns were filed, and whether taxes were owed for the years 1967 through 1972. This form also included a statement to be signed by the taxpayer authorizing the Internal Revenue Service (IRS) to mail the taxpayer's refund check to Westward's office in Seattle.

Westward also required the taxpayer to sign two power of attorney forms. The first was a form prepared by Westward labeled "General Power of Attorney" which gave John and Robert the power to receive, endorse, and collect the taxpayer's refund check. The second was IRS Form 2848 which gave John and Robert the power to act as attorneys in fact for the taxpayer and to receive the taxpayer's refund check.

When the taxpayer's return had been prepared and all the other forms completed, the Westward employee would take these documents, and a check made out to the taxpayer for two-thirds the amount of the refund, across the hall to John's office for approval. John would then review the documents in an effort to determine the validity of the taxpayer's W–2 Form and to make sure the refund was computed correctly. If John approved the transaction, he would sign the check which would then be given to the taxpayer.

John reviewed each transaction to ensure that Westward did not acquire refund claims based on false or fraudulent W–2 Forms. Although the taxpayer was required to sign an affidavit stating under penalty of perjury that the information on the W–2 Form was accurate, once Westward paid a taxpayer for his refund claim, the taxpayer had no obligation to repay Westward even if the IRS did not honor the taxpayer's refund claim.

Hence, when a refund was not made by the IRS, Westward sustained a loss on the transaction. For this reason, Westward refused to acquire the refund claims of all taxpayers who brought W–2 Forms into its office. Westward rejected approximately 15 percent of the 600 applications it received from taxpayers each year.

During 1973 and 1974, Westward began acquiring tax refund claims on January 15 and ceased acquiring refund claims on April 15. As refund checks were received, they were endorsed and deposited in Westward's bank account. All of Westward's gross receipts in 1973 and 1974 were derived from its business of acquiring and processing customers' tax refund claims. In 1973, Westward reported $224,122 as gross receipts, $179,737 as cost of operations, and $64,385 as gross income. In 1974, Westward reported $152,854 as gross receipts, $113,478 as cost of operations, and $39,376 as gross income.

Although John conducted his own tax consulting business, he spent several hours a day supervising Westward's activities. John also prepared Westward's income tax returns each year and arranged for Westward to borrow $80,000 from private investors in January of 1973 and 1974 to obtain the initial capital necessary to acquire refunds from taxpayers. Robert took no part in the day-to-day activities of Westward. Robert's only duties involved the auditing of Westward's books. Robert would regularly go to Westward's office in the evenings and audit all of the corporation's books and records. In 1973, Westward paid John and Robert $17,767, each, as compensation, and in 1974 Westward paid John $10,706 and Robert $11,121 as compensation.

## Cable Vision

I-Cable Vision Programmers, Inc. (Cable Vision), was incorporated on January 26, 1974. John owned 59 percent of the Cable Vision stock, his brother Robert owned 40 percent of the stock, and the remaining 1 percent was owned by Alan Morrow. Robert was president and John was secretary-treasurer of Cable Vision. On the same day Cable Vision was incorporated, it made an election effective in 1974 to be taxed pursuant to the provisions of subchapter S of the Internal Revenue Code.

Cable Vision was organized for the purpose of renting recorded video cassettes to cable television stations. During 1974,

Cable Vision contacted companies owning the film rights to old movies and acquired licenses to record these movies onto video cassettes. Cable Vision then purchased blank video cassettes and with rented equipment, Robert and Cable Vision's only employee, Lawrence Dawson, recorded these old movies onto the cassettes. The licensing agreements that Cable Vision entered into with the film companies also provided that Cable Vision was entitled to distribute the recorded cassettes for a fixed period of time. Thus, using a brochure prepared by Robert, Cable Vision contacted cable television stations by mail in an effort to rent these recorded cassettes.

In April 1974, Cable Vision acquired a license from the King Brothers in New York to record onto video cassettes the complete film library of the Little Rascals "Our Gang" comedy series. The King Brothers also gave Cable Vision the right to distribute the recorded cassettes for 1 year.

In June 1974, Hal Green (Green), a representative of General Electric Cable Vision Corp. (G.E.) contacted Robert about obtaining Cable Vision's video cassettes of the Little Rascals series for broadcast on one of G.E.'s cable television stations. Thereafter, Robert and Green entered an oral agreement whereby Cable Vision agreed to provide G.E. with video cassettes of 80 episodes of the Little Rascals "Our Gang" comedy series for a fee of $3,004.80. The billing invoices prepared by Cable Vision in connection with this transaction show that 29 episodes were shipped to G.E. on June 26, 1974, 15 episodes were shipped on July 16, 1974, and 7 were shipped thereafter. All 51 of these cassettes were shipped by Cable Vision to G.E.'s cable television station in Anderson, Ind. On July 26, 1974, Robert and a representative of G.E. signed a "Program License Agreement" that clarified the earlier oral agreement and provided that Cable Vision was granting G.E. a license to broadcast the 80 episodes for 1 year only. The pertinent provisions of this written agreement were as follows:

### PROGRAM LICENSE AGREEMENT

AGREEMENT made this 26th day of July, 1974, by and between I Cable-Vision Programmers, Inc., 1141 N. W. Market Street, Seattle, WA 98107 (herein called "ICV") and [General Electric Cable Vision Corp.] (herein called "Licensee").

ICV hereby grants to Licensee and Licensee hereby accepts, a license to make the following local television broadcasts during the term hereof in

accordance with the provisions set forth herein and in the Terms and Conditions on pages 2 through 4 attached hereto and hereby made a part hereof:

- I. PROGRAM SERIES: LITTLE RASCALS
- II. NUMBER OF PROGRAMS: 80
- III. NUMBER OF BROADCASTS: UNLIMITED FOR 12 MONTHS
- IV. FREQUENCY OF BROADCASTS: not more than UNLIMITED broadcasts per week.
- V. STATION: G.E. CABLE VIS. VI. CITY: ANDERSON IND.
- VII. METHOD OF BROADCAST C.A.T.V.
- VIII. OTHER LIMITATIONS:
- IX. STARTING DATE: JULY 9th.
- X. TERM: ONE YEAR.
- XI. NET LICENSE FEE: $3,004.80, payable in $1,001.60

with delivery and two consecutive monthly installments of $1,001.60 each commencing on the first day of AUGUST, AND SEPTEMBER 1974.

PRINTS TO BE DELIVERED TO: G.E. CABLE VISION CORP. 633 JACKSON ST. ANDERSON IND. 46016

\*       \*       \*       \*       \*       \*       \*

## TERMS AND CONDITIONS

1. USE OF PRINTS AND PROGRAMS. Licensee shall not make, authorize or permit any use of the "prints" [video cassettes] or programs other than as specified on page 1 hereof, including, without in any way being limited to, copying, duplicating, or sublicensing the use of, any program, print, or portion thereof, or authorizing or permitting the exhibition, whether by way of television broadcasting or otherwise, or any program, print, or portion thereof, in any theater, auditorium or other place to which an admission fee is charged, or doing anything which may impair the copyright in any program or portion thereof, or ICV title to the print thereof.

\*       \*       \*       \*       \*       \*       \*

3. DELIVERY AND RETURN OF PRINTS.

\*       \*       \*       \*       \*       \*       \*

(c) Licensee will return each print, prepaid, substantially in the same condition as received by Licensee, normal wear and tear excepted, to I Cable-Vision Programmers, Inc., 1141 N. W. Market Street, Seattle, WA 98107, or to such address as ICV may specify to Licensee: within twenty-four (24) hours, excluding Sundays and holidays, after the broadcast thereof or immediately upon termination or suspension of this Agreement. Delivery of the prints by Licensee to ICV, ICV agent or specified addressee, or a common carrier shall be deemed to be delivery by Licensee to ICV hereunder.

\*       \*       \*       \*       \*       \*       \*

15. OWNERSHIP. All rights and title in and to the programs and program

series, including but not limited to, prints thereof and the title or titles, names, stories, plots, incidents, ideas, formulas, formats, general content of the programs and any other literary, musical, artistic or creative material included therein (other than material in the public domain) shall, as between ICV and Licensee, remain vested in ICV.

\* \* \* \* \* \* \*

Pursuant to this agreement, G.E. made its three payments of $1,001.60 to Cable Vision on August 6, 1974, August 22, 1974, and October 1, 1974.

Although G.E. was obligated to return the video cassettes to Cable Vision, it did not do so. In a letter dated November 16, 1978, addressed to respondent's counsel in Seattle, K. C. Wilkes, a manager for G.E., explained why the video cassettes were not returned to Cable Vision:

> This letter is in further reply to your letter of October 19, 1978 regarding the Little Rascals program license agreement between I-Cable Vision and General Electric Cablevision Corporation. As a result of my conversation with our cable TV system manager in Anderson, Indiana, it appears that the tapes [video cassettes] we received were not returned. Eighty (80) episodes were contracted for in this license agreement, however we received only fifty-one (51). Since we had paid for 80 episodes, byt [sic] only received 51, we kept the tapes of the 51 episodes as a bargaining tool. However, at some time during the disagreement over the 29 episodes I-Cable Vision apparently went out of business. Therefore, the tapes with the 51 episodes were not returned and are therefore still in Anderson, Indiana.

Cable Vision was not successful in its efforts to rent its recorded video cassettes to cable television stations. Consequently, it ceased doing business at the close of 1974. Cable Vision prepared its petition in bankruptcy on December 20, 1974, and subsequently filed this bankruptcy petition on January 10, 1975. On April 10, 1975, Cable Vision was discharged in bankruptcy.

On its 1974 Federal income tax return, Cable Vision reported $4,838 in gross receipts. This sum included $3,004.80 from the license agreement with G.E. and $190 from other rentals of video cassettes. Cable Vision also reported $17,053 as cost of goods sold and $48,736 in deductible expenses. The expenses included amounts for equipment rental, depreciation, advertising, telephone, and video taping. As a result of its large expenditures, Cable Vision reported a loss of $60,951 in 1974. However, the total amount advanced to Cable Vision by all three shareholders during 1974 was only $33,750. As a shareholder in a subchapter S corporation, John, on his individual return for 1974,

reported his share of the loss as $19,913, which represented 59 percent of $33,750.[5]

### Advances to Cable Vision

When Cable Vision was incorporated in January 1974, the total capital contribution made by the three shareholders, John, Robert, and Alan Morrow, was $500. Between January 25, 1974, and July 23, 1974, John personally advanced $12,331.25 to Cable Vision, and through Westward, he advanced an additional $5,768.01 to Cable Vision[6] during this same period. Robert advanced in excess of $5,000 to Cable Vision in 1974. A schedule attached to Cable Vision's 1974 Federal income tax return indicated that John's share of the amounts advanced to Cable Vision in 1974 was proportionate to his ownership of the corporation and that such amounts represented his "invested money." Cable Vision executed two demand promissory notes, dated June 1, 1974, one in the amount of $18,275 payable to John and the other in the amount of $9,200 payable to Robert.

In the statutory notice sent to Westward, respondent determined that Westward's subchapter S election terminated for 1973 and 1974 because it received excessive passive investment income in those years. Respondent accordingly treated Westward as a separate taxable entity for 1973 and 1974 and completely disallowed the amounts Westward paid to John and Robert during these 2 years as unreasonable compensation.

In the statutory notice sent to John Thompson, respondent determined that Cable Vision's subchapter S election terminated in 1974 because it received excessive passive investment income in that year. Respondent consequently disallowed the $19,913 loss John had claimed on his 1974 return as his share of Cable Vision's loss for the year.

---

[5]On brief, petitioner John Thompson stated that his share of the total amount advanced to Cable Vision in 1974 was actually $19,901.36, and this amount constituted his deductible loss.

[6]Petitioner Thompson claimed to have personally advanced $19,901.36 to Cable Vision in 1974. However, the evidence petitioner Thompson introduced substantiates a personal advancement of only $12,331.25. In addition, petitioner Thompson claimed that he advanced $5,826.28 to Cable Vision in 1974 through Westward which was 50 percent of the total amount advanced to Cable Vision by Westward. Since petitioner actually owned 49.5 percent of Westward, his share of Westward's advances to Cable Vision is only $5,768.01.

OPINION

*Westward*

The first issue we must decide is whether more than 20 percent of Westward's gross receipts in 1973 was "interest" and therefore passive investment income within the meaning of section 1372(e)(5), so as to terminate its election under section 1372(a) to be treated as a small business corporation.

Section 1372(e)(5)(A) states the general rule that a corporation's subchapter S election shall terminate for any year in which the corporation has passive investment income in excess of 20 percent of its gross receipts. Section 1372(e)(5)(C) specifically includes "interest" as one type of "passive investment income."[7] We believe Congress intended the word "interest" in section 1372(e)(5)(C) to be used in its usual and commonly accepted sense. *Old Colony R.R. Co. v. Commissioner*, 284 U.S. 552, 560 (1932); *Marshall v. Commissioner*, 60 T.C. 242, 251 (1973), affd. 510 F.2d 259 (10th Cir. 1975); *Buhler Mortgage Co. v. Commissioner*, 51 T.C. 971, 978 (1969), affd. per curiam 443 F.2d 1362 (9th Cir. 1971). Nothing in the legislative history of section 1372(e)(5) indicates the word "interest" was to be construed otherwise.[8]

Interest is commonly defined as the amount paid per unit of time for use of borrowed money. *Deputy v. du Pont*, 308 U.S. 488, 497 (1940); *Old Colony R.R. Co. v. Commissioner, supra; Wilkerson v. Commissioner*, 70 T.C. 240, 253 (1978). The regulations under section 1372 also adopt this definition of the term "interest."[9] Thus, for an amount to constitute interest, it must

---

[7]SEC. 1372(e)(5). PASSIVE INVESTMENT INCOME.—

(A) Except as provided in subparagraph (B), an election under subsection (a) made by a small business corporation shall terminate if, for any taxable year of the corporation for which the election is in effect, such corporation has gross receipts more than 20 percent of which is passive investment income. Such termination shall be effective for the taxable year of the corporation in which it has gross receipts of such amount, and for all succeeding taxable years of the corporation.

\* \* \* \* \* \* \*

(C) For purposes of this paragraph, the term "passive investment income" means gross receipts derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities \* \* \*

[8]S. Rept. 1983, 85th Cong., 2d Sess. (1958), 1958–3 C.B. 922, 1010; S. Rept. 1007, 89th Cong., 2d Sess. (1966), 1966–1 C.B. 527, 532; S. Rept. 91–1535 (1970), 1971–1 C.B. 614.

[9]Sec. 1.1372–4(b)(5)(viii), Income Tax Regs., provides as follows:

"The term 'interest' as used in section 1372(e)(5) means any amounts received for the use of money (including tax-exempt interest and amount treated as interest under section 483)."

be paid or received on an existing, valid, and enforceable obligation and such amount must also be computed according to the passage of time. *Meilink v. Unemployment Comm'n.*, 314 U.S. 564, 570 (1942); *Christensen v. Commissioner*, 40 T.C. 563, 578 (1963); *Intercounty Operating Corp. v. Commissioner*, 4 T.C. 55, 63–65 (1944). Moreover, whether a given amount constitutes interest is a question of fact. *Wilkerson v. Commissioner, supra; L-R Heat Treating Co. v. Commissioner*, 28 T.C. 894, 897 (1957). See also *Green v. Commissioner*, 367 F.2d. 823, 825 (7th Cir. 1966), affg. a Memorandum Opinion of this Court.

In the present case, respondent takes the position that Westward in effect made loans to taxpayers when it advanced money to them with the expectation of repayment in the form of tax refund checks. Respondent therefore maintains that all of Westward's income on these transactions was interest because Westward was being paid for the use of its money. Respondent concludes that Westward's subchapter S election was terminated for 1973 and 1974 because Westward's passive investment income in the form of interest exceeded 20 percent of its gross receipts in 1973 and 1974.[10]

Petitioner Westward, on the other hand, argues that it did not make loans to taxpayers but instead purchased tax refund claims at a discount. Petitioner Westward points out that after it paid a taxpayer for his refund claim, the taxpayer had no obligation to repay Westward even if the refund was not forthcoming. Thus, petitioner Westward contends that the income it derived on the subsequent receipt of a refund check was discount income, not interest on loans, and, therefore, Westward did not have excessive passive investment income in 1973 or 1974.

Considering all the facts and circumstances, we conclude that the income Westward derived from the acquisition of tax refund claims at a discount does not constitute "interest" within the meaning of section 1372(e)(5).

The primary reason for our conclusion is that the requirement that interest be paid on indebtedness is lacking here. Once

---

[10]Under sec. 1.1372–4(b)(5)(iv), Income Tax Regs., amounts constituting loan repayments are not included in gross receipts. Consequently, if Westward's 1973 and 1974 gross receipts consist of only loan repayments and interest thereon as respondent contends, then the portion attributable to loan repayments must be eliminated leaving Westward's interest income equal to 100 percent of its gross receipts. See *Marshall v. Commissioner*, 60 T.C. 242, 250, affd. 510 F.2d 259 (10th Cir. 1975).

Westward paid a taxpayer for his refund claim, the taxpayer had no obligation to repay Westward, even if the refund was not forthcoming. In other words, the taxpayer was simply not indebted to Westward as a result of the transaction. Thus, we believe Westward purchased the rights to receive tax refunds at a discount rather than made loans with tax refunds as security. See *Thompson v. Commissioner*, 66 T.C. 1024, 1047 (1976). Compare *Elk Discount Corp. v. Commissioner*, 4 T.C. 196, 201–202 (1944), and *Southeastern Finance Co. v. Commissioner*, 4 T.C. 1069, 1083–1084 (1945), affd. 153 F.2d 205 (5th Cir. 1946). Since interest is a payment for the use of borrowed money, Westward's income was not interest because its income was not received on a valid, enforceable obligation but was instead derived from Westward's discount purchase of tax refund claims. See *Christensen v. Commissioner, supra.*

In addition, another element of interest is lacking in this case. The amount of the discount Westward received on each transaction was not computed according to the passage of time. See *Intercounty Operating Corp. v. Commissioner, supra.* On the contrary, Westward received a 33⅓-percent "discount charge" from each taxpayer regardless of when the refund might be received. We believe such a discount reflects Westward's estimate of the fair market value of a potential tax refund rather than a payment for the use of money.

Since we have found that the income Westward derived from the purchase of tax refund claims does not constitute "interest" within the meaning of section 1372(e)(5), we hold that Westward did not have passive investment income in excess of 20 percent of its gross receipts in 1973 or 1974 and was therefore a valid subchapter S corporation during 1973 and 1974.[11]

## Cable Vision

The second issue we must decide is whether more than 20 percent of Cable Vision's gross receipts in 1974 was "rent" and therefore passive investment income within the meaning of section 1372(e)(5). If so, then Cable Vision's election under section 1372(a) to be treated as a small business corporation

---

[11]Since we have held that Westward was a valid subch. S corporation during 1973 and 1974 rather than a separate taxable entity, we do not reach the issue raised by respondent in his statutory notice to Westward, whether the amounts Westward paid to John and Robert during 1973 and 1974 constituted unreasonable compensation.

terminated in 1974 with the result that petitioner Thompson is not entitled to deduct the $19,901.36 that he claimed as his share of Cable Vision's 1974 loss.

As set out above, section 1372(e)(5)(A) provides that a corporation's subchapter S election will terminate in a year in which the corporation has passive investment income in excess of 20 percent of its gross receipts.[12] Under section 1372(e)(5)(C), "rents" are included within the term "passive investment income." Section 1.1372–4(b)(5)(vi), Income Tax Regs., provides that "the term 'rents' as used in section 1372(e)(5) means amounts received for the use of, or right to use, property (whether real or personal) of the corporation." However, this same section of the regulations excludes certain payments from the definition of the term "rents":

> The term "rents" does not include payments for the use or occupancy of rooms or other space where significant services are also rendered to the occupant, such as for the use or occupancy of rooms or other quarters in hotels, boarding houses, or apartment houses furnishing hotel services, or in tourist homes, motor courts, or motels. Generally, services are considered rendered to the occupant if they are primarily for his convenience and are other than those usually or customarily rendered in connection with the rental of rooms or other space for occupancy only. * * *

Thus, if a corporation leases personal property and it renders services primarily for the convenience of the lessee other than those "usually or customarily" rendered in connection with such a lease and such services are "significant" in nature, then the income received by the lessor will not constitute "rents" for purposes of section 1372(e)(5). *Winn v. Commissioner*, 67 T.C. 499, 514 (1976), affd. in part and revd. in part 595 F.2d 1060 (5th Cir. 1979); *Bramlette Building Corp. v. Commissioner*, 52 T.C. 200, 204 (1969), affd. 424 F.2d 751 (5th Cir. 1970); *Feingold v. Commissioner*, 49 T.C. 461, 467 (1968). Moreover, in determining whether income should be treated as rent or as payment for the sale of property, the substance of the transaction and not the form is controlling. *Smith v. Commissioner*, 51 T.C. 429, 437–438 (1968); *Martin v. Commissioner*, 44 T.C. 731, 740 (1965), affd. 379 F.2d 282 (6th Cir. 1967).

In the present case, since Cable Vision only had $4,838 in gross receipts for 1974, including $3,004.80 from the "Program License

---

[12]See n. 7 *supra*.

Agreement" with G.E., if we find that the $3,004.80 constituted "rent," then Cable Vision's subchapter S election terminated in 1974 because its passive investment income would be in excess of 20 percent of its gross receipts for that year.

Petitioner Thompson asserts that although Cable Vision initially intended to rent the recorded cassettes to G.E., when Cable Vision determined that there was no rental market for its cassettes, the transaction with G.E. evolved into a sale. He maintains the fact that G.E. did not return the cassettes demonstrates that the transaction had evolved into a sale by the end of 1974. In the alternative, petitioner Thompson claims that Cable Vision engaged in substantial business activity in preparing the cassettes for shipment to G.E., including rental of equipment, advertising, and recording of cassettes, and that these activities constitute "significant services." He therefore concludes that the amounts Cable Vision received from G.E. did not constitute "rents."

Respondent argues that under the terms of the "Program License Agreement," G.E. was only entitled to the use of the cassettes for 1 year and, thus, it is clear that the amounts G.E. paid Cable Vision constitued "rents." With respect to petitioner's alternative argument, respondent's position is that petitioner has not proven what, if any, "significant services" Cable Vision rendered to G.E. in connection with the license agreement and, consequently, that the exception provided by section 1.1372–4(b)(5)(vi), Income Tax Regs., is inapplicable.

We disagree with petitioner Thompson's argument that Cable Vision's transaction with G.E. evolved into a sale. The evidence in the record indicates that the parties structured the transaction as a rental agreement and then performed according to the terms of such rental agreement.

Under the "Program License Agreement" signed by Robert and a representative of G.E. on July 26, 1974, G.E. as "licensee" agreed to pay Cable Vision a "net license fee" of $3,004.80 for the right to broadcast the recorded cassettes containing 80 episodes of the Little Rascals "Our Gang" comedy series for 1 year beginning July 9, 1974. Also, paragraph 15 of the agreement specifically provided that all rights and title in the cassettes and programs thereon, as between Cable Vision and G.E., remained vested in Cable Vision. Pursuant to this agreement, Cable Vision shipped cassettes containing 51 episodes to

G.E.'s station in Anderson, Ind., and G.E. paid Cable Vision the "net license fee" of $3,004.80 in three equal installments.

In addition, the fact that G.E. did not return the cassettes to Cable Vision does not demonstrate, as petitioner contends, that the transaction evolved into a sale by the end of 1974. In a letter dated November 16, 1978, addressed to respondent's counsel in Seattle, K. C. Wilkes, a manager for G.E., explained why the cassettes were not returned. In the letter, Wilkes stated that G.E. contracted with Cable Vision for 80 episodes, but Cable Vision delivered only 51, so G.E. kept the cassettes of the 51 episodes as a bargaining tool, and because Cable Vision went out of business during the dispute over the 29 remaining episodes, the cassettes of the 51 episodes were never returned. Considering this explanation, we do not believe that G.E.'s retention of the cassettes proves that the parties intended the transaction to be a sale.

In light of the clarity of the terms of the "Program License Agreement" and the actions of the parties in connection with this agreement, we conclude that, in substance as well as form, the transaction between Cable Vision and G.E. was not a sale but rather a rental agreement in which G.E. paid Cable Vision for the use of the recorded cassettes for 1 year.

We also reject petitioner Thompson's alternative argument that the amounts G.E. paid to Cable Vision did not constitute "rents" because Cable Vision rendered "significant services" to G.E. in connection with the license agreement. Although Cable Vision engaged in various activities in its rental business including equipment rental, advertising, and recording of cassettes, the only service Cable Vision rendered to G.E. was the shipment of the cassettes to G.E.'s cable television station in Anderson, Ind. Petitioner Thompson offered no evidence to prove that this service of shipping the cassettes was in any way "significant." Moreover, it is clear to the Court that this shipping service rendered by Cable Vision is a service that is "usually and customarily" rendered in similar rental businesses. Thus, we conclude that Cable Vision did not render "significant services" to G.E. in connection with the license agreement.

Accordingly, we hold that the $3,004.80 Cable Vision received from G.E. in 1974 constituted "rent" within the meaning of section 1372(e)(5) and, therefore, Cable Vision's subchapter S election terminated in 1974 because its passive investment

income exceeded 20 percent of its gross receipts for that year. Consequently, petitioner Thompson is not entitled to deduct the $19,901.36 that he claimed as his share of Cable Vision's 1974 loss.

## Advances to Cable Vision

The third and final issue we must decide is whether petitioner John Thompson is entitled to a bad debt deduction under section 166[13] in 1974 for advances he made to Cable Vision during 1974.[14]

Petitioner Thompson claimed that between January 25, 1974, and July 23, 1974, he personally loaned Cable Vision $19,901.36, and that through Westward he loaned Cable Vision an additional $5,826.28 during this same period.[15] As evidence of these loans, petitioner points to the demand promissory note Cable Vision executed on June 1, 1974, in the amount of $18,275 payable to petitioner. Petitioner concludes that since Cable Vision prepared its bankruptcy petition in December 1974 and was discharged in bankruptcy in April 1975, the loans he made to Cable Vision in 1974 became worthless in 1974 and, therefore, petitioner is entitled to a bad debt deduction in 1974 for these amounts.

---

[13]SEC. 166. BAD DEBTS.

(a) General Rule.—

(1) Wholly worthless debts.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

(2) Partially worthless debts.—When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

\*  \*  \*  \*  \*  \*  \*

(d) Nonbusiness Debts.—

(1) General rule.—In the case of a taxpayer other than a corporation—

(A) subsections (a) and (c) shall not apply to any nonbusiness debt; and

(B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.

(2) Nonbusiness debt defined.—For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—

(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or

(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

[14]Under sec. 1376(b)(2), a shareholder's basis in any debt owed to him by his subch. S corporation must be reduced by the amount of the shareholder's portion of the corporation's net operating loss for the taxable year to the extent that such amount exceeds the shareholder's basis in his stock. Hence, in the present case, if Cable Vision had been a valid subch. S corporation in 1974 we would not need to consider this bad debt issue because petitioner Thompson's share of Cable Vision's 1974 loss would have apparently reduced his basis in the alleged loans to zero.

[15]See n. 6 *supra.*

Respondent, on the other hand, argues as follows: First, the advances made by petitioner are contributions to the capital of Cable Vision and are not deductible. Second, if a valid debtor-creditor relationship existed between Cable Vision and petitioner with respect to the amounts in question, then any loss is not deductible in 1974 because the debts were not worthless in that year. Finally, respondent maintains that if the debts were worthless in 1974, they were nonbusiness rather than business bad debts.

The determination of whether advances made by a stockholder to a corporation create a true debtor-creditor relationship or actually represent contributions to capital depends on the particular facts of each case. *John Kelly Co. v. Commissioner,* 326 U.S. 521 (1946); *A. R. Lantz Co. v. United States,* 424 F. 2d 1330, 1334 (9th Cir. 1970). In making the determination of whether advances of the type in the present case constitute debt or equity, the courts have considered a number of factors including the following: the relationship between the parties; whether the corporation is adequately capitalized; whether the advances are made in proportion to shareholder's interest in the corporation; whether interest was payable on the amounts advanced; whether a debt instrument was executed; whether an outsider would have made similar advances without security; and whether such advances were placed at the risk of the business and thus constituted investment capital. *A. R. Lantz Co. v. United States, supra* at 1333; *Davis v. Commissioner,* 69 T.C. 814, 836 (1978); *Litton Business Systems, Inc. v Commissioner,* 61 T.C. 367, 376 (1973); *Family Group, Inc. v. Commissioner,* 59 T.C. 660, 669 (1973). The burden of proving that amounts advanced to a corporation constitute loans rather than capital contributions is on the taxpayer. *Baumann & Co. v. Commissioner,* 312 F.2d 557, 558 (2d Cir. 1963), affg. a Memorandum Opinion of this Court; *Yale Avenue Corp. v. Commissioner,* 58 T.C. 1062, 1074 (1972).

After taking into account the above factors, we conclude that the amounts petitioner Thompson advanced to Cable Vision during 1974 constituted contributions to capital.[16]

To begin with, when Cable Vision was incorporated in early

---

[16]We note that because petitioner Thompson raised this bad debt issue for the first time in an amendment to his petition filed after trial, there is very little documentary evidence and even less testimony in the record to explain the circumstances surrounding the making of these advances.

1974, the total capital contribution by all three shareholders was only $500. The advances in excess of $20,000 made by petitioner and his brother, Robert, during 1974 were apparently Cable Vision's only other source of capital. When the small amount of initial capital is compared with the large amount of alleged loans, it is evident Cable Vision was undercapitalized. In addition, a schedule attached to Cable Vision's 1974 return clearly indicates that petitioner's share of the amounts advanced to Cable Vision in 1974 was proportionate to his ownership of the corporation and that such amounts represented his "invested money." Moreover, there is no evidence in the record to show that petitioner's advances were secured and considering Cable Vision's meager financial success throughout 1974, we do not believe an outsider would have made similar advances without security. Finally, although Cable Vision executed a demand promissory note payable to petitioner, petitioner offered no evidence as to whether demand for repayment had ever been made or when such repayment was contemplated. Nor did he offer any evidence to prove that the note was actually executed on June 1, 1974. Also, there is no explanation as to why no note was executed with respect to the advances made to Cable Vision after June 1, 1974. Thus the existence of this note, by itself, is insufficient evidence to prove that the advances made by petitioner to Cable Vision were loans. See *A. R. Lantz Co. v. United States, supra.*

Accordingly, because we have found that the $12,331.25 petitioner Thompson personally advanced to Cable Vision and the $5,768.01 he advanced to Cable Vision through Westward in 1974 constituted contributions to capital, we hold that petitioner Thompson is not entitled to a bad debt deduction under section 166 in 1974 for such advances.[17] However, nothing herein is to be construed as preventing such amounts from being added to the basis of petitioner's stock in Cable Vision. See sec. 1.118–1, Income Tax Regs.

---

While petitioner Thompson's brother, Robert, testified that these advances were loans, the Court found his testimony vague, inconsistent, and lacking in credibility.

[17]Due to our conclusion that petitioner's advances were capital contributions, we need not consider respondent's second and third arguments.

896

To reflect the foregoing,

*Decisions will be entered under Rule 155.*