JACK FULLER AND BEVERLY FULLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, RespondentFuller v. CommissionerDocket No. 12195-77.United States Tax CourtT.C. Memo 1980-370; 1980 Tax Ct. Memo LEXIS 217; 40 T.C.M. (CCH) 1184; T.C.M. (RIA) 80370; September 10, 1980, Filed *217 Petitioner-husband participated in two taxqualified employees' plans and was the sole owner of the sponsoring employer. On March 3, 1975, the plans' tax-exempt trusts transferred a total of $39,000 to petitioner-husband. Held: The March 3, 1975, transfers were bona fide loans, and not distributions by the trusts (sec. 402(a)(1)). Held further: Respondent failed to prove that the debts arising from the loans were discharged in 1975 (sec. 61(a)(12)). Alvin R. Wohl and Michael P. Casterton, for the petitioners. Alan Summers, for the respondent. CHABOTMEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income tax against petitioners, and by amended answer revised his determinations (sec. 6214(a)), 1 as follows: Deficiency perDeficiency perYearNotice of DeficiencyAmended Answer1972$7,501$ 7,16119733,8751,75819746,817019755,53115,076After concessions by the parties, the issue for decision is whether transfers of funds from two tax-exempt employees' trusts to petitioner-husband *218 gave rise to taxable income to petitioners in 1975, as either of the following: (1) distributions (sec. 402(a)(1)), or (2) loans giving rise to debts discharged (sec. 61(a)(12)) in 1975.2 FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition in this case was filed, *219 petitioners, Jack Fuller (hereinafter sometimes referred to as "Fuller") and Beverly Fuller, husband and wife, resided in Sacramento, California. Fuller was engaged in the redwood lumber business in the vicinity of Sacramento, California, for more than 20 years. This business, known variously as "Fuller Lumber Company", "Fuller Redwood", "Fuller Redwood Co.", or "Fuller Lumber and Supply Company" (hereinafter referred to as "Lumber"), was conducted as Fuller's sole proprietorship. Lumber's business was the providing of redwood for fencing, decking, and other home construction use. Redwood Consultants, Inc. (hereinafter referred to as "Consultants"), was incorporated under the laws of California on October 1, 1973. From that date to the time of trial Fuller owned all of Consultants' outstanding stock, and was its president, treasurer, and sold director. On October 1, 1973, Consultants entered into a management services agreement and an exclusive sales agency agreement with Lumber, whereby Consultants was to have the exclusive management of Lumber's business and was to be exclusive sales agent for Lumber's prefabricated fence product line. On October 1, 1973, Consultants adopted *220 the Qualified Employer's Retirement Plan--Pension (hereinafter sometimes referred to as "the Pension Plan") and the Qualified Employer's Retirement Plan--Profit Sharing (hereinafter sometimes referred to as "the Profit-Sharing Plan"), intended to qualify under section 401(a). (Hereinafter the Pension Plan and the Profit-Sharing Plan are sometimes collectively referred to as "the Plans"). The Pension Plan was a money-purchase plan. The Plans' vesting provisions provided for 20 percent vesting per year of participation. From October 1, 1973, through November 30, 1975, there were three participants in the Plans--Fuller, Ica Ingraham (hereinafter referred to as "Ingraham"), and Virginia Zanetti (hereinafter referred to as "The Trusts"). The Redwood Consultants, Inc. Retirement Trust--Pension (hereinafter sometimes referred to as "the Pension Trust") was formed under the Pension Plan; the Redwood Consultants, Inc. Retirement Trust--Profit Sharing (hereinafter sometimes referred to as "the Profit-Sharing Trust") was formed under the Profit-Sharing Plan. (Hereinafter the Pension Trust and the Profit-Sharing Trust are collectively referred to as "the Trusts"). The Trusts were formed *221 on January 7, 1974, and were intended to be exempt under section 501. The trustees of the Trusts were Fuller and Ingraham; they remained the trustees through the date of the trial in the instant case. The Trusts' trust agreements, as originally executed, provided the trustees with various investment powers subject to the direction of an administration committee. Consultants, the Plans, and the Trusts adopted fiscal years ending February 28. Ingraham was employed by Lumber from July 1, 1959, to October 1, 1973. In early 1973, she did bookkeeping work for Lumber. On October 1, 1973, she became an employee of Consultants, for which she did bookkeeping work until November 30, 1975, after which she again became an employee of Lumber. On or about March 7, 1974, the Pension Trust lent $4,000 to Lumber. Fuller (as Lumber's sole proprietor) wrote a letter to himself and Ingraham (as trustees of the Pension Trust) authorizing this loan to be made from his Pension Trust account. As part of the loan transaction, Fuller executed a promissory note on behalf of Lumber, dated March 7, 1974, to the Pension Trust for $4,000, with interest thereon at a 10-percent annual rate, payable in full on *222 the later of March 7, 1975, or on demand. A security agreement of March 7, 1974 3 (hereinafter referred to as "the 1974 Security Agreement"), between Lumber and the Pension Trust granted the Pension Trust a security interest (under the California Uniform Commercial Code) in Lumber's inventory (both then-existing and after-acquired) as security for the $4,000 loan and for any sums thereafter advanced by the Pension Trust to Lumber. The 1974 Security Agreement was signed by Fuller and Ingraham as the Pension Trust's trustees, and by Fuller on behalf of Lumber. A financing statement covering the property described in the 1974 Security Agreement was filed on May 2, 1974, with the office of the Secretary of State in Sacramento, California. The financing statement was dated March 7, 1974; it listed Lumber as the debtor and the Pension Trust *223 as the secured party; and (as was the 1974 Security Agreement) it was signed by Fuller and Ingraham as the Pension Trust's trustees, and by Fuller on behalf of Lumber. Lumber's inventory in Sacramento and Sonoma (Counties, California, was not encumbered by any other loans. No termination of the financing statement security interest in inventory had been filed through the date of the trial in the instant case. The 1974 Security Agreement was amended on March 1, 1975, to provide that the Profit-Sharing Trust was to be treated as a secured creditor, together with the Pension Trust; otherwise, the 1974 Security Agreement was continued in full force and effect. (Hereinafter the March 1, 1975, amendment to the 1974 Security Agreement is referred to as "the 1975 Amendment".) No modification was made to the March 7, 1974, financing statement. Petitioners signed an "Agreement to Guarantee Payment of Notes and Renewals" dated March 7, 1974. Under this agreement, petitioners personally guaranteed the repayment of the $4,000 loan and any future loans from the Pension Trust or the Profit-Sharing Trust to Lumber or to Consultants. Repayment of the principal and payment of the accrued interest *224 in the total amount of $4,348.67 was made by Fuller to the Pension Trust on January 21, 1975. By contract dated October 1, 1973, Consultants and Fuller agreed that Fuller was to serve full time as Consultants' president, general manager, management consultant, and sales representative at Sacramento, California. For this work, Fuller was to receive $5,000 per month base salary, plus commissions and bonuses. The following resolution was approved at the March 1, 1975, meeting of Consultants' board of directors (Fuller being Consultants' only director): WHEREAS, the President and Sole Director of the Corporation [Consultants], JOHN M. FULLER [Fuller], on October 1, 1973, entered into an Employment Contract with the Corporation providing for, among other things, a basic monthly salary, a sales commission and an annual bonus. The Corporation's cash flow has not permitted the payment of the full amount of compensation for the fiscal years ended February 28, 1974 and February 28, 1975, and WHEREAS, said JOHN M. FULLER has agreed to accept, for the time being, the $48,000.00 compensation paid to him for the fiscal year ended February 28, 1975 and the $25,000.00 for the year ended February *225 28, 1974, on the condition that at such time as Corporation's income and cash flow permits, the deficiencies under said Employment Contract can be accrued and dispursed [sic] to him without further action of this Board, thereupon the following resolution was adopted: RESOLVED, that the compensation payments to the Corporation's President and Sole Director, JOHN M. FULLER, for the fiscal years ended February 28, 1974 and February 28, 1975 is ratified; and, FURTHER RESOLVED, that the deficiency between the compensation paid and that provided for in the Employment Contract between said JOHN M. FULLER in the Corporation dated October 1, 1973, may be paid at such times and in such amounts as in the discretion of the President of the Corporation, JOHN M. FULLER, as will not impare the Corporation's working capital and cash flow needs. FURTHER RESOLVED, that the Corporation's Pension and Profit Sharing Plans [the Plans] be amended in the forms attached to these Minutes as Exhibit "A" and "B", to provide for loans from the Trust established under said plan to participants of the plans in amounts not to exceed their respective account balances, such loans to be adequately secured and bear *226 reasonable interest. [Emphasis in original.] On March 1, 1975, Consultants lent Fuller $65,000 at six percent interest. The debt is payable on demand, or on March 1, 1985, if no demand is made. Fuller signed a promissory note to that effect. On March 3, 1975, Consultants received $94,488.27 as payment for management fees and commissions from Lumber. Contributions by Consultants to the Profit-Sharing Trust were to be determined by resolution of Consultants' board of directors from year to year. On March 1, 1975, Consultants' board of directors authorized a contribution of $6,337.96 to the Profit-Sharing Trust for the fiscal year ended February 28, 1975. On March 3, 1975, contributions were made by Consultants to the Trusts for their fiscal years ended February 28, 1975, and February 28, 1976, as indicated in table 1. Table 1 Plan YearThe PensionThe Profit-SharingEnded February 28,TrustTrust1975$ 9,506.95$ 6,337.96197615,000.0010,000.00 On March 3, 1975, the Pension Trust transferred $25,000 to Fuller. Fuller signed a promissory note dated March 1, 1975, for $25,000 with interest from March 1, 1975, at a 9-1/2 percent annual rate on the unpaid balance, payable to the Pension *227 Trust in 120 equal installments of $323.50 on the first day of each month, ending March 1, 1985. 4 The promissory note also provided that it was secured under the 1974 Security Agreement, as amended by the 1975 Amendment. Payments on this note were made, deposited in the Pension Trust's checking account, and allocated between principal and interest as shown in table 2. Table 2 DateDateMadeDepositedPrincipalInterestBalance$25,000.004- 1-754-28-75$125.58$197.9224,874.425-14-755-20-75126.58196.9224,747.846-12-756-16-75127.58195.9224,620.46 *7- 8-757-10-75128.59194.9124,491.87 *8-12-758-14-75129.61193.8924,362.26 *9-25-7510-20-75130.63192.8724,231.63 *10-16-7510-20-75131.66191.8424,099.97 *11-14-7511-18-75132.71190.7923,967.26 *12-18-7512,22-75133.76189.7423,833.50 *1-17-761-20-76134.82188.6823,698.68 *6- 2-766- 4-76140.09938.0523,558.39*228 On March 3, 1975, the Profit-Sharing Trust transferred $14,000 to Fuller. Fuller signed a promissory note dated March 1, 1975, for $14,000 with interest from March 1, 1975, at a 9-1/2 percent annual rate on the unpaid balance, payable to the Profit-Sharing Trust in 60 equal installments of $294.03 each month, ending March 1, 1985. 5*229 The promissory note also provided that it was secured under the 1974 Security Agreement, as amended by the 1975 Amendment. Payments on this note were made, deposited in the Profit-Sharing Trust's checking account, and allocated between principal and interest as show in table 3. Table 3 DateDateMadeDepositedPrincipalInterestBalance$14,000.004- 1-754-28-75$183.20$110.8313,816.805-14-755-20-75184.65109.3813,632.156-12-756-16-75186.11107.9213,446.047- 8-757-10-75187.58106.4513,258,468-12-758-14-75189.07104.9613,069.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-20-75 190.56103.4712,878.8310-16-7510-20-75192.07101.9612,686.7611-14-7511-18-75193.59100.4412,493.1712-18-7512-22-75195.1398.9012,298.041-17-761-20-76196.6797.3612,101.376- 2-766- 4-76258.64479.0011,842.73On their 1975 Federal individual income tax return petitioners' itemized interest expense deductions included the following: Redwood Cons. Profit Sharing Plan1035Redwood Cons. Pension Trust1654Ingraham was consulted and made aware of the loans made March 3, 1975, and, as a trustee, did not object to the loans. She believed that they were good loans and that they were secured by Lumber's inventory. On February 26, 1974, respondent ruled that the Plans were tax-qualified. Sometime in 1975, after Fuller had discussions with an agent of respondent, Fuller received notice from respondent that respondent viewed Consultants as a "sham" corporation, *230 and that respondent was disallowing Consultants' deductions for contributions to the Plans. By letter dated September 3, 1975, respondent proposed to retroactively revoke the favorable determination letters for both of the Plans and both of the Trusts. At the November 24, 1975, meeting of Consultants' board of directors it was resolved to terminate the management agreement between Lumber and Consultants effective November 30, 1975, and to temporarily discontinue Consultants' operations as of December 1, 1975. It was decided that Consultants would remain in existence and that the Plans would continue. It was also resolved to amend the Plans to provide for immediate 100-percent vesting, which was done in November of 1975. It was resolved that the contributions to the Plans for the year ended February 28, 1976, should be $10,080 to the Pension Plan and $6,720 to the Profit-Sharing Plan. To the extent that the contributions made on March 3, 1975, were in excess of these amounts, the excess was returned to Consultants by checks dated February 26, 1976. It was resolved to terminate the employment agreement between Fuller and Consultants. As of February 28, 1976, Fuller's account *231 balances in the Pension Trust and the Profit-Sharing Trust were $22,620.34 and $11,363.73, respectively. Effective November 30, 1975, Ingraham and Zanetti terminated their employment with Consultants and their participation in the Plans. Around November of 1975, Fuller decided to discontinue payments on the loans while considering the proper action to take regarding the adjustments proposed during audit. In 1976, forms were filed with respondent for each of the Plans, showing that the Plans were terminating as of March 1, 1976, but that the Trusts were to be continued in order to pay benefits under the Plans. Fuller's June 2, 1976, payments to the Trusts (see tables 2 and 3, supra) were in the amounts necessary to provide enough cash in the Trusts' checking accounts to distribute Ingraham's and Zanetti's account balances in the Trusts to them. On the advice of the Trusts' accountant, and by checks dated May 26, 1976, the Trusts distributed to Ingraham and Zanetti their entire vested interests in the Trusts. Ingraham received $2,070.45 from the Pension Trust and $1,512.30 from the Profit-Sharing Trust. Zanetti received $1,859.81 from the Pension Trust and $1,323.60 from the Profit-Sharing *232 Trust.Thereafter, the balances of cash in the Trusts have been zero. The Plans' annual information returns (Form 5500-C) for their plan years ended February 28, 1977, and February 28, 1978, each showed Fuller's debt to the plan as the respective plan's only asset at the end of the year. Business Property Statements filed by Lumber with the assessor's offices of Sacramento and Sonoma Counties for the years 1974 through 1978 reported costs of Lumber's taxable inventory on hand as shown in table 4. Table 4 SacramentoCountyYearCountyof SonomaTotalMarch 1, 1974$24,041$20,896$44,937March 1, 197532,35419,30351,657March 1, 197638,65227,40066,052March 1, 197743,78723,65067,437March 1, 197871,871071,871Petitioners' net worth, as of December 31 of 1974, 1976, and 1977, and as of November 30, 1975, substantially exceeded the sum of the balances on the promissory notes to the Trusts. From 1973 to the time of trial, petitioners have not included any amounts in gross income as a result of contributions made on behalf of Fuller to the Plans, the vesting of his benefits in the Plans, or any other transactions involving Fuller and either of the Plans or either of the Trusts.The March 1975 transfers *233 from the Trusts to Fuller were loans. OPINION Respondent contends that amounts received by Fuller from the Trusts in 1975 constitute taxable income to petitioners in 1975 either as distributions from the Trusts or, in the alternative, as discharges of debts. Petitioners contend that the transactions in 1975 were at all times during 1975 bona fide loans and, therefore, not taxable. The burden of proof is on respondent as to both of his contentions. 6*234 We hold for petitioners on both points. I. Loans or DistributionsSection 402(a)(1)7*235 provides the general rule for the taxability of a beneficiary of an exempt employees' trust--in the year in which an amount is distributed or made available, the amount is to be taxed under section 72, which generally provides for current taxation of distributions as ordinary income. Respondent contends that "[the] net amounts of $23,558.39 and $11,842.73 8 received by Fuller from Pension Trust and Profit-Sharing Trust, respectively, in 1975 should be taxed as distributions to the petitioners in 1975." Petitioners contend that the transactions were bona fide loans. Whether the amounts Fuller received from the Trusts were loans is essentially a factual question, to be determined on the basis of the record herein. The scores of reported opinions involving the issue of whether a valid indebtedness exists provide guidance and suggest relevant indicia, but they do not themselves provide the answer. The following indicia of "debt" appear in the instant case: (1) The amounts were evidenced by formal debt instruments in the form of notes, providing regular repayment terms and an interest rate that the parties consider to have been a good *236 interest rate for loans in 1975. The amounts of the payments were sufficient to pay off the debts and interest within the terms of the notes without requiring "balloon payments", if the original schedule of the repayments had been adhered to. (2) The notes were secured. The 1974 Security Agreement, as amended by the 1975 Amendment, created a security interest in inventory in the Trusts and this security interest was perfected, as to the Pension Trust, by the previously filed financing statement. 9 The amounts of inventory securing the debts were at all times during the year in excess of the amount of the debts. See table 4, supra.(3) The notes were personally guaranteed by petitioners, who had a net worth substantially exceeding the debts. (4) The transactions were treated as loans on the Trusts' books and records. (5) Monthly repayments on the promissory notes were made from April 1975 through January 1976. (6) Fuller testified that the transactions were loans and that at all times during 1975 he fully intended to repay the resulting *237 debts. (7) A trustee of the Trusts, Ingraham, was aware of the loans and did not object to them. (8) In 1974, Lumber had borrowed $4,000 from the Pension Trust with similar formalities and had timely repaid the $4,000 loan in full. (Respondent has conceded that this 1974 transfer was in fact a loan.) The following indicia of "distribution" appear in the instant case: (1) Payments to the Trusts were made with some degree of casualness (almost two weeks late on the average) and sometimes were deposited with even more casualness (on two occasions, almost four weeks after receipt). (2) Fuller stopped making any payments on the promissory notes after January 1976, except for the June 1976 payments.(3) Fuller sat on all sides of the table, so to speak, with regard to decisions about the Plans and the Trusts. (4) Both promissory notes errors as to dates and one as to an amount (see notes 4 and 5, supra). Although a transaction that is not at arm's length is subject to close scrutiny, this does not of itself justify our disregarding for tax purposes the form of the transaction. See, e.g., H. B. Zachry Co. v. Commissioner,49 T.C. 73, 81 (1967). When we give close scrutiny to the transfers *238 in the instant case, their proper characterization is far from clear. 10 However, on balance we conclude that treating the transfers as loans by the Trusts is more consistent with the record before us than is treating them as distributions from the Trusts. This conclusion is strengthened by our efforts to analyze respondent's current position.We are given no explanation of how we are to reconcile respondent's conclusion that the transfers of $25,000 and $14,000 were distributions ab initio, and respondent's conclusion that only the net amounts should be taken into income. We are given no explanation as to why Fuller's 1976 repayments should be taken into account for 1975 under respondent's theory that the transfers were distributions in 1975. We are given no explanation as to why the netting should be accomplished by taking into account only those parts of Fuller's payments that were allocated to principal (see tables 2 and 3, supra). We are given no explanation as to how the remaining *239 parts of the payments could properly be allocated to interest--and be deducted by petitioners for the years before us without challenge--unless there were real debts to which the interest related. See. e.g., Thompson v. Commissioner,73 T.C. 878, 887-889 (1980). Respondent asserts that Fuller's "withdrawal of funds from the Trusts on March 3, 1975, was the final step in a plan seeking to create tax deductions by the circular transfer of money through the Fuller-controlled entities." Respondent envisions the following scenario: (a) Lumber transfers $94,488.27 to Consultants (via the management services agreement), for which Fuller receives a business expense deduction; (b) Consultants lends $65,000 to Fuller; (c) Consultants contributes $40,844.91 to the Trusts (more than half of which was for the year ended February 28, 1976), for which Consultants takes a contribution deduction; and (d) the Trusts transfer $39,000 to Fuller. Respondent argues that Consultants "functioned solely as a conduit" and that the result of these transactions was that Fuller ended the series with the same money he started with, in the form of loan proceeds, 11 "except *240 for the artificially created tax deductions." The most that can be said for this scenario is that it might be plausible if respondent had made a different set of determinations. 12*241 If respondent is asserting that the transfers of March 1 and 3, 1975, were sham transactions and should be collapsed, we would be left with the conclusion that Fuller never really received distributions from the Trusts. This is inconsistent with respondent's assertion that Fuller received distributions from the Trusts.If Fuller merely received his own money, thereby putting him back in his original position, the return of his money should not be a taxable event. The parties on brief frame the issue in terms of whether the transfers from the Trusts to Fuller were taxable distributions from the Trusts. Respondent has not disallowed any of the "artificially created" deductions. If respondent's reference to "artificially created tax deductions" is an attack on the deductibility of the management fee, he is raising a new matter which we refuse to address at this stage of the proceedings. If respondent is inviting us to hold the transfers to Fuller to be distributions, as a way of making up for the asserted impropriety of the deductions, we decline the invitation. On the record as a whole, we conclude that the transfers from the Trusts to Fuller were loans to Fuller. On this point we hold for petitioners. II. Discharge of DebtSection 61(a)(12)13*242 provides that gross income includes income from the discharge of debt. Having concluded that Fuller's receipts from the Trusts were loans, we must now determine whether respondent has carried his burden of proving that the resulting debts were discharged at any time during the years before us.Stated differently, did it first become reasonable to assume at any time during 1975 that the debts created in early March 1975 were not going to be repaid? Fuller regularly made monthly payments to the Trusts through January of 1976. The balances Fuller owed on the notes were carried on the records of the Trusts as assets through 1975. The loans appear to have been adequately secured through 1975. There is no evidence that the Trusts were terminated during 1975.The only evidence that the debts might not be repaid is that of Fuller's decision in November 1975 to suspend payments while considering the proper action to take regarding respondent's audit. We agree with petitioners that suspending payments is not always evidence of an intent not to repay. In the absence of any other evidence that the debts were discharged in 1975, we conclude that respondent has *243 failed to carry his burden of proof. On this point we hold for petitioners. To reflect the concessions made by the parties and the conclusions reached herein, Decision will be entered under Rule 155.Footnotes1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the taxable years in issue.↩2. Respondent's adjustment decreasing the amount of petitionenrs' investment credit carryback to 1972 is solely computational in nature; it depends on resolution of the income issue described in the text, supra.In their petition, petitioners claimed reimbursement for reasonable attorney fees and costs pursuant to 42 U.S.C. 1988. We take it that this claim has been abandoned since it is not discussed on brief. In any event, see Kipperman v. Commissioner, 622 F.2d 431 (CA9 1980), affg. an unpublished order of this Court; Key Buick Co. v. Commissioner, 68 T.C. 178 (1977), affd. 613 F.2d 1306 (CA5 1980). In their petition, petitioners also requested a declaratory judgment that the two employees' plans involved were tax-qualified under section 401. At trial, petitioners withdrew this prayer for relief (see n. 6, infra↩).3. The 1974 Security Agreement was dated March 7, 1973. We are convinced that the correct date is March 7, 1974, on the basis of (1) uncontroverted testimony at the trial, (2) the security agreement's reference to the date of the promissory note (March 7, 1974), and (3) the fact that the lender (the Pension Trust) was not created until January 7, 1974.↩4. The Pension Trust promissory note states that interest is to run from March 1, 1985, and that the last payment is due April 1, 1981. The dates set forth in our findings (interest from March 1, 1975, and the last payment due March 1, 1985) are consistent with the note's provisions as to interest rate and as to the number, frequency, and amount of the required payments.↩*. These balances reflect a 20-cent error in the Pension Trust's loan repayment record. This error appears to have been corrected in the entry for the June 2, 1976, payment.↩5. The Profit-Sharing Trust promissory note states that the last payment is due April 1, 1981. The note also states, "Principal and interest payable in Sixty (60) equal installments of TWO HUNDRED NINETY FOUR AND 03/100 ($254.03) or more each". The last date (March 1, 1980) and monthly payment amount ($294.03) set forth in our findings are consistent with the note's provisions as to interest rate and as to the number and frequency of the required payments and the amounts of the payments that were made.6. In the notice of deficiency, respondent determined that the Plans were not tax-qualified, ab initio (because they did not meet the coverage requirements of sec. 401(a)), and that the contributions made on Fuller's behalf were taxable to petitioners in the years for which they were made. By amended answer, respondent conceded that the Plans initially were tax-qualified but maintained that they became disqualified in operation in 1975, and that the contributions made on Fuller's behalf were taxable to petitioners in 1975. The parties subsequently stipulated that the Plans were tax-qualified, and the Trusts were exempt, for all plan years from the Plans' inceptions through February 28, 1976. Respondent concedes that the contributions to the Trusts did not give rise to income to petitioners for any of the years before the Court. Respondent also concedes he has the burden of proof on the dispute as finally presented herein, dealing with transfers from the Trusts to Fuller.7. SEC. 402. TAXABILITY OF BENEFICIARY OF EMPLOYEES' TRUST.(a) Taxability of Beneficiary of Exempt Trust.-- (1) General rule.--Except as provided in paragraphs (2) and (4), the amount actually distributed or made available to any distributee by any employees' trust described in section 401(a) which is exempt from tax under section 501(a) shall be taxable to him, in the year in which so distributed or made available, under section 72↩ (relating to annuities). * * * 8. The transfers from the Trusts to Fuller were $25,000 and $14,000, respectively. The principal balances (see tables 2 and 3, supra) as of the end of 1975 were $23,833.30 (see note at end of table 2, supra) and $12,298.04, respectively. The amounts respondent now seeks to include in petitioners' 1975 income (see n. 6, supra↩) are the respective principal balances after Fuller's 1975 repayments and his repayments of January 17, 1976, and June 2, 1976.9. Respondent concedes that the 1974 Security Agreement and the financing statement apply to loans to Fuller, himself, as well as to loans to Lumber.↩10. How much of this lack of clarity is properly chargeable to petitioners is itself unclear, in view of respondent's successive shifts of position and in view of the burden of proof. See n. 6, supra.↩11. Respondent makes no effort to reconcile his scenario's initial transfer by Fuller of $94,488.27, with Fuller's receipts of loans aggregating $104,000.↩12. It is interesting to note that the one case respondent chose to cite in support of his position on opening brief, Lansing v. Commissioner,T.C. Memo. 1976-313, had as its "primary issue for decision" the question of whether a trust of an employees' pension plan "had sufficient economic reality to be recognized under the tax law." Consideration of that "primary issue" has been foreclosed in the instant case by respondent's concession that the Plans were tax-qualified under section 401(a) and the Trusts were tax-exempt under section 501(a)↩ until February 28, 1976.13. SEC. 61. GROSS INCOME DEFINED. (a) General Definition.--Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: (12) Income from discharge of indebtedness;↩